UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADNAN KHAN, a/k/a MENACE,<br><br>PLAINTIFF<br><br>v.<br><br>NAVARRO GRAY, THE GRAY LAW FIRM, LLC, DANIEL DESIR, AND TIMELESS MUSIC ENTERTAINMENT, LLC,<br><br>DEFENDANT | CASE NO. 21-cv-<br><br><br>**AFFIDAVIT OF MERIT PURSUANT TO N.J.S.A. 2A:53A-27** |

STATE OF NEW JERSEY   )
                                              : ss.:
COUNTY OF BERGEN      )

I, Raphael Rosenblatt, Esq., of full age, upon my oath depose and say:

1.     I am an attorney that has been licensed to practice law in the State of New Jersey since 1998. I received my *juris doctor* from Georgetown University Law Center in 1998. I am currently in private practice where I devote a substantial portion of my professional time to complex commercial, legal malpractice, securities, consumer fraud, insurance, , white collar criminal, and financial services litigated matters in the state and federal courts in New Jersey, among others.

2.     A true and correct copy of my curriculum vitae is annexed hereto as <u>Exhibit A</u>.

3.     I have reviewed the following records in connection with the allegations made by the plaintiff in this action, Adnan Khan, true and correct copies of which are annexed hereto as described below:

     i.   The Complaint (*See* <u>Exhibit B</u>);

     ii.  The Timeless Agreement (*See* <u>Exhibit C</u>);

iii.   The Stellar Songs Agreement (*See* <u>Exhibit D</u>)

iv.   The Royalties Letter of Direction (*See* <u>Exhibit E</u>);

v.   The Advance Letter of Directoin (*See* <u>Exhibit F</u>)

vi.   The Desiigner Production Agreement (*See* <u>Exhibit G</u>);

4.      Based on my review of those records, it is my opinion that there exists a reasonable probability that the care, prudence, diligence, skill, or knowledge exercised or exhibited in the treatment, practice or work exercised by Navarro Gray and the Gray Law Firm, LLC that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices that are ordinarily and reasonably possessed and exercised by members of the legal profession similarly situated.

5.      I have particular expertise in this case because it involves breaches of New Jersey's Rules of Ethics, which can be prima facie evidence of legal malpractice, and the standard of care of attorneys. In addition to my private practice, I have been a member of the District Ethics Committee, which is a panel appointed by the Supreme Court of New Jersey to investigate allegations of wrongdoing by attorneys. I have also appeared as an expert witness in legal malpractice actions.

6.      I have no financial interest in the outcome of this case.

_____
Raphael Rosenblatt

Sworn to before me the
_30_ th day of June, 2021

_____
Notary Public
**SUSAN HUBER**
**A Notary Public of New Jersey**
**My Commission Expires April 15, 2023**

# Exhibit A



Phone: 551.444.8100
Facsimile: 551.497.4665
www.rosenblattlegal.com

**RAPHAEL M. ROSENBLATT**

Email: raphael@rosenblattlegal.com
Attorney at Law
Member, NY &NJ Bars

## CURRICULUM VITAE:
## RAPHAEL M. ROSENBLATT, ESQ.

### LEGAL EXPERIENCE:

- **Rosenblatt Law PC, Hackensack, NJ** (May 2014 to Present):

  - Private law practice consisting of complex commercial litigation, including matters involving claims of professional malpractice; legal fee dispute matters and fee arbitrations; FINRA & JAMS arbitrations; and general commercial litigated matters.
  - Criminal defense, including charges involving assault, robbery, weapons, controlled dangerous substances, and driving while intoxicated.
  - Civil forfeiture practice involving litigation to recover assets seized at time of arrest.
  - Service as expert witness in cases involving legal malpractice, legal ethics, and attorney fee dispute matters arising from underlying criminal and civil litigations and transactions.

- **Bloomberg LP, New York, NY** (March 2009 – December 2013)

  - Legal analyst – founding editor and contributing author to monthly subscription-based law reports covering legal developments in the area of White Collar Crime.  Editor and author of subscription-based law reports covering legal developments in the area of Securities and Derivatives.
  - Author of practice tools for legal practitioners in substantive areas of law, including: white collar criminal defense, general litigation, insurance litigation, securities litigation, compliance, and derivatives.

- **McCarter & English, LLP, Newark, NJ** (June 2004-March 2009)

  - Associate – trial attorney for law firm acting as national coordinating counsel for large life insurance provider.

*MAILING ADDRESS: PO Box 1932, South Hackensack, NJ 07606*
*OFFICE ADDRESS: 21 Main Street, Suite #151, Hackensack, NJ 07601 (**NEW SUITE #)*



Page 2 of 4

- o Handled all aspects of complex litigated matters in courts in New York, New Jersey, Pennsylvania, Illinois, Kentucky, and Texas, as well as NASD/FINRA arbitrations.

- **Hellring Lindeman Goldstein & Siegal LLP, Newark, NJ** (October 2000-June 2004)

  - o Associate – responsible for handling all aspects of commercial litigated matters, including bankruptcy, white collar criminal, matrimonial, consumer fraud, and insurance coverage matters.

- **District Attorney of Nassau County, Nassau County, NY** (August 1998-October 2000)

  - o Prosecuted all manner of misdemeanor and DWI matters.  Successfully managed caseload of approximately 175 open cases.
  - o Lead counsel in six jury trials and two non-jury trials that were tried to verdict.

## EXPERT QUALIFICATIONS:

- Extensive experience representing both plaintiffs and defendants in legal malpractice and client fee-dispute matters, including fee arbitration matters.
- Extensive experience as first-chair trial attorney in complex commercial litigation matters in courts of various jurisdiction.
- Extensive experience representing defendants charged with felony and misdemeanor crimes in New Jersey and New York courts, as well as DWI and traffic offenses.
- Consulting expert on numerous legal malpractice matters, including, but not limited to: Chaparro Nieves v. Office of the Public Defender, (New Jersey-based, State's expert in action alleging malpractice in handling criminal matter); Sasala v. State of New Jersey, (New Jersey-based, State's expert in action alleging malpractice in handling criminal matter); Steinberg v. Durant, (Pennsylvania-based, alleging legal malpractice in handling of criminal matter); Elizabeth Board of Education v. McCarter & English, LLP, (New Jersey-based, alleging improper billing); Glasby v. Jones (New Jersey-based, negligence in the sale of real estate); Gwynn v. Murphy & Falcon (Maryland-based, negligence in handling personal injury matter).
- Member, Board of Directors, LegalMalpractice.com, Inc. – Research, editing, and consulting regarding expert testimony and expert reports.

## EDUCATION:

- Law School – Georgetown University Law Center (JD, 1998)
  - o Member, American Criminal Law Review
- Undergraduate – Yeshiva University (B.A., 1995)
  - o Magna cum laude



Page 3 of 4

**BAR ADMISSIONS:**

- New Jersey
- New York
- Southern District of New York; Eastern District of New York; District of New Jersey

**HONORS & PROFESSIONAL ACHIEVEMENTS:**

- Recognized by 201 Magazine as among "Top Lawyers in Bergen County" for "Litigation" (2017)
- Member, Supreme Court of New Jersey, District Ethics Committee (District V-A, Essex County) (2008-2009)
- Recognized as "Rising Star" by New Jersey Superlawyers, 2006, 2007, 2008

**PUBLICATIONS:**

- New Jersey Law Journal
  - Co-author: "Court Approves Lawyers' Use of Trade Names," (N.J. Law Journal, N.J. Supreme Court Year in Review 2014-2015, Legal Ethics & Malpractice – 9/28/2015)
  - Co-author: "Judicial Integrity and Public Confidence are Court's Primary Concerns This Term," (N.J. Law Journal, N.J. Supreme Court Year in Review 2013-2014, Legal Ethics & Malpractice – 9/1/2014)
  - Co-author: "The Enormity of Our Fiduciary Responsibilities," (N.J. Law Journal, N.J. Supreme Court Year in Review 2007-2008, Legal Ethics – 9/8/08)
  - Co-author: "Court Reaffirms American-Rule Exception to Enforce Fiduciary Duty," (N.J. Law Journal, N.J. Supreme Court Year in Review 2002-2003, Legal Ethics – 9/1/03)
  - Co-author: "Third Party Escrow Funds Entitled to Same Protection as Client Trust Funds," (N.J. Law Journal, N.J. Supreme Court Year in Review 2001-2002, Legal Ethics – 9/02/02)
  - Co-author: "Making Things Clear," (N.J. Law Journal, N.J. Supreme Court Year in Review 2000-2001, Legal Ethics – 9/3/01)
  - Co-author: "Getting Down to the Reason for the Rule" (N.J. Law Journal, N.J. Supreme Court Year in Review 1999-2000, Legal Ethics – 9/4/00)

- Bloomberg Law Reports
  - Founding editor and contributing author, Bloomberg Law Reports, White Collar Crime – monthly publication covering recent developments, cases, regulations, legislation and other matters of interest concerning white collar crime, including FCPA, corruption, honest services fraud, RICO, insider trading, mail and wire fraud, securities fraud, money laundering, risk and compliance, and federal criminal procedure
  - Contributing author and editor, Bloomberg Law Reports, Securities Law – weekly publication covering recent developments, cases, proposed rules,



**Page 4 of 4**

comment letters, enforcement actions, FINRA arbitrations and industry guidance, and other matters of interest concerning securities law and regulation, including SEC enforcement, criminal securities fraud, and insider trading

o Contributing author and editor, <u>Bloomberg Law Reports, Derivatives Law</u> – bi-weekly publication covering recent developments, cases, proposed rules, comment letters, enforcement actions, industry analysis, and other matters of interest concerning derivatives law, including the Dodd-Frank Wall Street Reform and Consumer Protection Act, commodities, swaps and security-based swaps, and other derivatives products

- <u>American Criminal Law Review</u>
    o Co-author: "Mail and Wire Fraud," in Twelfth Survey of White Collar Crime, 34 Am. Crim. L. Rev. 771 (1997).

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ADNAN KHAN, p/k/a MENACE,<br><br>                    Plaintiff,<br><br>          v.<br><br>NAVARRO GRAY, THE GRAY LAW FIRM, LLC, DANIEL DESIR, AND TIMELESS MUSIC ENTERTAINMENT, LLC,<br><br>                    Defendant. | CASE NO. 21-cv-13352 |

Plaintiff Adnan Khan, by his attorneys Gallet Dreyer & Berkey, LLP, as and for his Complaint, alleges with personal knowledge as to his own actions, and upon information and belief as to those of others, as follows:

**Preliminary Statement**

1.      This action arises from the attempt of the defendants, talent manager Daniel Desir and his company Timeless Music Entertainment, LLC ("Timeless"), and Desir's business partner and attorney Navarro Gray of the Gray Law Firm, LLC ("GLF"), to extract hundreds of thousands of dollars from of the plaintiff, Adnan Khan, p/k/a "Menace," a musician and beats producer, that defendants had no entitlement to receive.

2.      The defendants negotiated an artist management agreement between Khan and Timeless(the "Timeless Agreement"). Pursuant to the Timeless Agreement, Khan agreed to pay Timeless twenty percent of the "gross monies" Khan received during the term of that agreement, and smaller percentages pursuant to a sunset clause dwindling to nothing following the sixth anniversary of the Timeless Agreement's termination.

3.     Gray and Daniel Desir have been business associates for years. Thus, when Stellar Songs, Ltd. ("Stellar") offered Khan a publishing agreement, Desir and Gray agreed, without Khan's knowledge, that Gray would act as counsel for Khan in the deal with Stellar.

4.     Gray, on behalf of himself, his firm, and Timeless, advised Khan to sign irrevocable Letters of Direction (the "LODs") instructing Stellar to pay twenty percent of the royalties due to Khan directly to Timeless, and an *additional* five percent to Gray's firm GLF as well as twenty percent and five percent respectively of Khan's royalty advance.

5.     Gray had never counseled Khan about the LODs or Gray's "cut" of Khan's monies, and Gray certainly never entered into a retainer agreement with Khan that informed him of Gray's fee structure. In fact, at all times, Gray and GLF were acting in the interests of Desir and Timeless, not Khan. Nonetheless, Gray and GLF sought out and took a substantial portion of Khan's royalties for which they were never entitled. Despite never explaining to Khan the extent of Gray's and GLF's purported entitlement to a substantial portion of the advance and future royalties as legal fees, and despite the fact that Gray and GLF never entered into a written agreement to provide Khan with legal services, Gray and GLF took these royalties as "legal fees."

6.     Additionally, Timeless failed to provide even the most basic management level of service that it was required to perform under the Timeless Agreement. Then, in May 2018, after Desir and Timeless had secured their royalties from the publishing agreement with Stellar, Desir cancelled the Timeless Agreement. However, in the notice of cancellation, Timeless and Desir claimed entitlement to the full twenty percent of Khan's "gross monies," a claim that Gray later confirmed in writing, supposedly on Khan's behalf. Gray purposely ignored the clear and unambiguous sunset clause at the cost of his supposed client Khan, only to benefit his real clients, Timeless and Desir.

7.      Khan's attempts to resolve these issues without the Court's involvement have failed. In fact, Desir, Timeless, and Gray continue to collect from Khan's royalties despite his clear protests.

## Jurisdiction and Venue

8.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as it is a suit between a citizen of a foreign state and citizens of New Jersey and New York, and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and (b)(2). On information and belief, all of the defendants reside in this district and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within this district.

## Parties

9.      Plaintiff Adnan Khan is a producer and "beat" maker who records and performs under the name "Menace." Khan is a citizen and resident of the United Kingdom.

10.     Defendant Gray is an attorney who is admitted to the bar of the State of New Jersey, where Gray provides services. Upon information and belief, Gray is a resident of the State of New Jersey.

11.     Defendant GLF is a limited liability corporation formed under the laws of the State of New Jersey. GLF's principal place of business is located at 10 Banta Place, Suite 114, Hackensack, New Jersey 07601. Upon information and belief, Gray is the sole attorney at GLF.

12.     Defendant Desir is the Chief Executive Officer of Timeless. Upon information and belief, Desir is a resident of the State of New Jersey.

3

13.     Defendant Timeless is a limited liability corporation formed under the laws of the State of New York. Timeless's principal place of business is located at 10 Banta Place, Suite 114, Hackensack, New Jersey 07601.

14.     On information and belief, Timeless is the mere alter ego of Desir, which Desir dominates and operates not as a separate entity but as an extension of Desir, and which he abuses the corporate privilege to perpetrate injustice and circumvent the law and his own personal responsibility.

15.     On information and belief, Timeless lacks adequate capitalization and is or is nearly insolvent, does not observe corporate formalities, does not pay dividends, maintains no corporate records, has no other functioning officers or directors other than Desir and is merely a façade for the operations of Desir, individually. On information and belief, Timeless is a shell without sufficient assets to satisfy any judgment and justice and equity require the corporate fiction of Timeless to be pierced to hold Desire personally liable for its acts.

## **Operative Facts**

### Khan and Timeless's Contract

16.     In 2015, Khan produced the hit song "Panda", which shot Khan to international fame and garnered the attention of music industry giants such as Kanye West.[1]

17.     With Panda's success, Khan also obtained the attention of Timeless CEO Desir. Desir solicited Khan in early 2016 through social media, and suggested to Khan that Desir, through Timeless, could manage Khan. Desir informed Khan that Desir had contacts in the music industry worldwide and could substantially advance Khan's career and exposure.

---

[1] https://www.rollingstone.com/music/music-features/panda-producer-menace-on-creation-of-kanye-approved-hit-231600/

18.    Shortly after Desir reached out to Khan, Desir sent Khan the Timeless Agreement, which had been drafted by defendants Gray and GLF.

19.    In April 2016, Khan and Timeless entered into the Timeless Agreement, in which Khan agreed to provide "a 'Commission' to [Timeless] in an amount equal to twenty (20%) percent of all Gross Monies."

20.    "Gross Monies" is defined in the Timeless Agreement as "any and all income received by [Khan] in connection with [Khan]'s production, engineering, mixing, and editing services to be provided by [Khan]."

21.    In return, Timeless agreed to provide the following "services":

> Manager shall advise, counsel and represent Producer with respect to decisions concerning employment, publicity, selection of projects and/or material, public relations and advertising, and all other matters pertaining to Producer's entertainment career an [*sic*] in all areas of same, including, but not limited to sound recordings (specifically, the production, engineering, mixing and editing of same), music publishing, personal appearances, product endorsements and merchandising/commercial exploitation of Producer's name and likeness.

22.    The Timeless Agreement was for a term of four years. After the Timeless Agreement ended, either through expiration or termination, Timeless would be entitled to ever-shrinking commissions, according to the following "sunset" schedule:

| Post Term | Manager's Commission |
|-----------|----------------------|
| 1         | 15.0                 |
| 2         | 10.5                 |
| 3         | 7.0                  |
| 4         | 5.0                  |
| 5         | 2.5                  |

23.     Thus, for example, three years after the Timeless Agreement is terminated, Timeless is only entitled to a seven percent commission, at most.

24.     By its own terms, "the validity, interpretation and legal effect of this [Timeless] Agreement shall be governed by the laws of the State of New Jersey without regard to any conflict of laws principles."

<u>Gray and GLF are, and Always Have Been Timeless's Attorneys</u>

25.     Gray and GLF have been working for Desir and Timeless for years, well before Desir approached Khan.

26.     Gray and GLF continue to work for Timeless and Desir. In an October 2019 interview with L3 Magazine, Desir stated that "Navarro Gray covers our legal entity of the business." In an October 2020 interview, Desir again mentioned Navarro Gray as one of "our attorneys…"

27.     In April 2020, Gray and GLF acted as the filing attorney of record for a Timeless trademark, Registration No. 88893387.

28.     Gray and GLF maintain the exact same office space as Timeless, down to the same suite.

<u>Gray Negotiates a Significant Portion of Khan's Royalties for Himself</u>

*Gray and GLF's Negotiation of the Stellar Songs, Ltd. Publishing Agreement*

29.     In April 2016, Stellar sought to obtain exclusive publishing rights as to Panda. Timeless informed Khan that Khan should speak to Timeless's attorney, Gray of GLF, regarding publishing.

30.     Gray received a proposed publishing agreement from Stellar, and within a matter of days Gray presented Khan with the executed version of the publishing agreement along with

corresponding LODs for the benefit of Timeless/Desir and Gray of GLF.  Gray drafted the proposed LODs with Stellar, pursuant to which Stellar was required to forward twenty percent of all royalties owed to Khan to Timeless.

31.     Gray also issued another LOD directing Stellar to pay an *additional* five percent of Khan's advances and royalties to Gray and GLF.

32.     LODs are customary in the music industry and are revocable instructions from the artist to publishers, labels, and public performance societies to make payments to third parties.

33.     LODs are generally revocable. However, the LODs negotiated by Gray and GLF are both irrevocable. Gray and GLF never disclosed to Khan that the LODs would be irrevocable nor explained to Khan what this meant. Gray and GLF also never explained why they made the LODs irrevocable.

*Gray and GLF's Negotiation of Desiigner's Publishing Rights*

34.     Desir learned that Khan had inadvertently assigned publishing rights to Sidney Selby, p/k/a "Desiigner," in the "Producer Agreement" pertaining to the song "Panda." Before Desir and Gray agreed to offer Khan a formal management deal, Desir dispatched his long-time attorney and collaborator, Gray to rectify the situation.

35.     Khan knew that Gray had been recommended by Timeless and agreed to follow his advice.   However, Khan was not aware of Gray's true agenda: to clear the path so that his real client, Desir of Timeless, could collect on Khan's future royalties.

36.     Gray reached out to Desiigner's counsel and requested an "Addendum" to the Producer Agreement, to which Desiigner. Khan reasonably believed that Gray was working in Khan's best interests and signed the Addendum as well.

37.     Unknown to Khan, Gray and GLF had placed a provision in the Producer Agreement with Desiigner that funneled a five percent share of Khan's royalties to Gray and GLF arising from the Producer Agreement and Addendum.

38.     Gray and GLF never drew up and negotiated a retainer agreement for Khan to sign. Gray and GLF never informed Khan that Gray and GLF would seek an additional five percent of Khan's royalties, and Gray and GLF never informed Khan of the reason why Gray and GLF were purportedly entitled to that additional five percent.

39.     Rather, at all times, Gray and GLF acted as Timeless's attorney. Timeless and Desir referred to Gray as "Timeless' attorney" in communications and Desir claimed in interviews that Gray is his business partner who handles the "legal" aspects of Timeless's business.

40.     Although Gray and GLF had no retainer agreement with Khan, Gray and GLF invoiced Stellar for a portion of Khan's advance, specifically, $35,000 of that advance. Gray and GLF claimed on the invoice that the invoice reflected payment for "legal fees."

41.     Gray and GLF performed legal services, purportedly on behalf of Khan, in a manner that benefitted Desir and Timeless and ensured that Desir and Timeless would earn a management fee, to Khan's detriment.

42.     On information and belief, Gray and GLF have collected more than $100,000 in royalties and advances from Khan's earnings.

The Timeless Agreement is Terminated, But Timeless Seeks the Full Twenty Percent

43.     Desir and Timeless never performed any of the services outlined in the Timeless Agreement, and certainly never moved Khan's career forward or provided the exposure promised.

8

44.     One example of Desir and Timeless's failure to provide the contracted-for services involves Gray and GLF beginning to negotiate an agreement between Khan and musician Blac Youngsta.

45.     Khan had been approached to produce Youngsta's album, and Khan informed Timeless of this opportunity.

46.     Gray and GLF had negotiated some aspects of Khan's deal with Youngsta, but then abruptly stopped negotiating with Youngsta. Desir, Timeless, Gray and GLF simply stopped communicating with Youngsta. That deal only materialized years later due to the efforts of Khan's new manager.

47.     On information and belief, once Gray and GLF held themselves out as Khan's attorney, third parties contacted Gray and GLF about opportunities for Khan.

48.     Desir and Timeless never intended to perform the services required of them in the Timeless Agreement, and Desir and Timeless never directly performed any of those services. Rather, Desir and Timeless simply collected royalties on deals which they had not originated.

49.     An example of this is Gray and GLF's negotiation with Desiigner. Shortly after Gray and GLF cleared Khan's publishing agreement between Khan and Stellar with Desiigner, which freed up more royalties for Desir and Timeless, Desir and Timeless terminated the Timeless Agreement.

50.     In May 2018, after Timeless and Gray "cashed in" on Panda's success, Desir informed Khan that Timeless was terminating the Timeless Agreement. Timeless sent a "Termination Notice" to Khan in which Timeless stated "this termination in no right shall effect Timeless Music Entertainment's benefit of 20% off music and projects worked during the contract period."

51.     The portion of the Termination Notice in which Timeless claimed its entitlement to twenty percent of Khan's earnings is incorrect. Timeless was only entitled to a twenty percent commission of all Gross Monies "received… or credited to Producer's account, during the Term" of the Timeless Agreement, as set forth in paragraph 3 of that Agreement. Any monies received after the Term are subject to the provisions of the sunset clause set forth in paragraph 3(d) of the Timeless Agreement.

52.     Gray, acting at Desir's behest and on behalf of Timeless and Desir, approached Khan and informed Khan he should continue to pay twenty percent commissions to Timeless. During this conversation, Gray never counseled Khan that Timeless was not entitled to the twenty percent commission and provided no basis for payment of the higher commission amount.

53.     On June 21, 2018, Gray and GLF replied to Timeless' termination notice, purportedly on behalf of Khan. In that reply, Gray and GLF purportedly confirmed "the 20% payout on the items you have worked on."

54.     Thus, rather than enforce the provisions of the sunset clause that Gray and GLF had written, Gray and GLF made a written statement to Timeless, an opposing party, to Khan's detriment.

55.     The Timeless Agreement requires any modification to be made in writing, executed by both parties. The parties never executed a modification of the Timeless Agreement to permit Timeless to collect twenty percent commissions after its termination, and Gray has never informed Khan that the purported "modification" is ineffective because it was not set forth in a signed writing. Gray's purported "confirmation" does not meet this requirement, as Gray and GLF actually only ever worked for Timeless and Desir.

56.     Gray's and GLF's act of undermining Khan for Timeless's benefit illustrates that a clear conflict existed between Khan and Timeless, and that Gray could not continue to represent both of those parties without a competent waiver. Gray never obtained any such waiver, and never bothered to explain that conflict to Khan.

57.     Nevertheless, Timeless contends it is still entitled to twenty percent of Khan's "gross monies," while Gray and GLF continue to claim they are entitled to five percent of Khan's royalties from Stellar. In fact, Timeless continues to collect twenty percent, and Gray and GLF continue to collect five percent of the royalties that Stellar pays Khan, despite the fact that Timeless, Gray and GLF are not entitled to any of those amounts.

58.     Khan continues to generate royalties from the period the Timeless Agreement was in effect, including from Stellar, to which Timeless and Gray claim they are entitled, while Khan contends Timeless and Gray are not so entitled to those royalties.

59.     In fact, in March 2021, Stellar paid the full commission on the advance to Gray, GLF and Timeless, despite Khan's protests to Stellar. Stellar refused to stop payment on the LODs to Gray, GLF and Timeless because, as drafted by Gray and GLF, those LODs are irrevocable.

60.     To date, Timeless has collected at least $397,639.93 of Khan's royalties, while Gray and GLF have collected $102,693.50 of Khan's royalties.

## FIRST CLAIM
(*Legal Malpractice – Against Gray and GLF*)

61.     Khan repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

62.     Gray and GLF created an attorney-client relationship with Khan, which in turn created a duty of care that Gray and GLF owed to Khan.

63. Gray and GLF breached their duty of care to Khan by failing to enter into a retainer agreement, by failing to describe their fee structure, by failing to charge reasonable fees, by failing to inform Khan of Gray's and GLF's conflict of interest by representing both Khan and Timeless, and by falsely informing Timeless that Khan had consented to pay Timeless commissions of twenty percent after the Timeless Agreement was terminated.

64. Gray's and GLF's actions as alleged herein violate at least the following New Jersey Rules of Professional Conduct:

a. Rule 1.1: requiring competence in representation;

b. Rule 1.4(c): requiring sufficient communication to clients;

c. Rule 1.5(a): requiring that fees charged are reasonable;

d. Rule 1.5(b): requiring fees be communicated in writing;

e. Rule 1.7: requiring conflicts of interest be disclosed and consented to in writing;

f. Rule 1.8(a): requiring conflicts of interest originating from business transactions with client be disclosed and consented to in writing.

65. Since Gray and GLF actually worked for Timeless and Desir, any fees accrued by Gray and GLF in this matter should have been paid by Timeless and Desir and not taken from Khan's earnings.

66. The breaches of care by Gray and GLF are the proximate cause of damages to Khan, which include but are not limited to the more than $100,000 that Gray and GLF negotiated for themselves, to which Kahn is entitled. Kahn is additionally entitled to disgorgement of all amounts paid or collected by Gray and GLF, interest, and the costs of this suit.

SECOND CLAIM
(*Breach of Contract – Against Desir and Timeless*)

67.     Khan repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

68.      Khan and Timeless entered into the Timeless Agreement, which obligated Khan to provide commissions to Timeless in return for services that Timeless would provide.

69.     Khan provided Timeless with the commissions which he was required to under the Timeless Agreement and otherwise fully and faithfully performed any obligations that Khan had under the Timeless Agreement.

70.     However, Timeless materially and substantially breached the Timeless Agreement by failing to provide Khan with the services promised, including but not limited to Timeless' failure to consummate the Youngsta producer deal.

71.     Timeless and Desir's actions additionally violate the duty of good faith and fair dealing that attaches to all agreements.

72.     Timeless' breach of the Timeless Agreement caused Khan to lose opportunities to advance his career and enter into other, lucrative contracts.

73.     Timeless and Desir breached the Timeless Agreement by continuing to collect twenty percent of Khan's royalties after the Timeless Agreement was terminated.

74.     Timeless' breach of the Timeless Agreement caused Khan damages in an amount more than $75,000.

75.     As a direct and proximate result of Timeless and Desir's actions in breach of Timeless's contractual duties, Khan has been damaged in an amount to be determined at trial, but in any event not less than $100,000, plus interest, for which Timeless and Desir are jointly and severally is liable.

13

76.     Desir is further liable under the Timeless Agreement as Timeless is merely an alter ego of Desir, used to circumvent justice and Desir's personal liability.

### THIRD CLAIM
(*Unjust Enrichment – Against Desir, Timeless, Gray and GLF*)

77.     Khan repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

78.     As an alternative cause of action, if the Timeless Agreement is found to be invalid or not controlling, Khan alleges that Timeless and Desir were unjustly enriched.

79.     As an additional, alternative cause of action, if Gray and GLF are found not to have had any written agreement between themselves and Khan, Khan alleges that Gray and GLF were unjustly enriched.

80.     Timeless, Gray and GLF have obtained amounts that were not due to them under the Timeless Agreement or any other agreement. Timeless, Gray and GLF continued to collect commissions that are due to Khan when Timeless, Gray and GLF were never entitled to those amounts.

81.     Timeless continued to collect amounts after it was no longer entitled to collect any amount, and Gray and GLF collected more than $100,000, although Gray and GLF never had any agreement with Khan that permitted Gray and GLF to collect that amount, and Gray and GLF never performed any services worth the amount collected from Khan.

82.     Khan has been damaged in an amount no less than $100,000 collected by Desir, Timeless, Gray and GLF.

<u>FOURTH CLAIM</u>
(*Breach of Fiduciary Duty – Against Desir, Timeless, Gray and GLF*)

83.    Khan repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

84.    The defendants owed a fiduciary duty to Khan. Khan placed his trust and confidence in the defendants. The defendants owed Khan a duty to act on his behalf, and give advice, for Khan's benefit.

85.    The defendants breached that duty to Khan by falsely claiming that Khan had agreed to provide the defendants with twenty percent of Khan's commissions after the parties had terminated their agreement.

86.    Gray and GLF further breached their fiduciary duty to Khan by representing Desir's and Timeless's interests at the expense of Khan's interests, as described above.

87.    The defendants' breach has caused and will continue to cause damages to Khan, in that the defendants' breach had caused Stellar to divert funds to them to which they are not entitled.

<u>FIFTH CLAIM</u>
(*Declaratory Relief – Against Desir, Timeless, Gray and GLF*)

88.    Khan repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

89.    A case and controversy has arisen between Desir, Timeless, Gray and GLF and Khan.

90.    The defendants contend Timeless is still entitled to twenty percent of Khan's royalties, based upon the statements of Timeless's agents Gray and GLF that Khan agreed to pay Timeless twenty percent commissions after the Timeless Agreement was terminated. Khan contends that any such purported agreement between Desir, Timeless and Gray and GLF is

unenforceable as it has not been made in writing, executed by both parties in accordance with the terms of the Timeless Agreement.

91.     Under the LODs negotiated by Gray and GLF, Gray and GLF continue to take royalties that are rightfully due and owing to Khan, despite Khan's attempt to revoke the LODs.

92.     Khan contends that, at this time, Timeless is owed less than twenty percent of any royalties according to the post-termination payment schedule, or alternatively, that Timeless is owed no royalties due to Timeless' breach of the Timeless Agreement.

93.     Khan further contends that, at this time, Gray and GLF are owed no percentage of any royalties, or alternatively, that any amounts due to Gray and GLF are the responsibility of Timeless.

94.     Stellar currently owes substantial payments to Khan. The defendants therefore claim they are entitled to an additional amounts. Further, Stellar will continue to pay Khan royalties, of which the defendants claim they are entitled to a portion of those ongoing payments.

95.     Khan therefore seeks a declaration that Desir, Timeless and its agents Gray and GLF, are not entitled to any further amounts paid to or for the benefit of Khan, and that Khan is entitled to all amounts collected by Gray and GLF and that Khan is entitled to all amounts collected by Desir and Timeless that are greater than that set forth in the Timeless Agreement.

SIXTH CLAIM
(*Equitable Accounting – Against Desir, Timeless, Gray and GLF*)

96.     Khan repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

97.     Desir, Timeless, Gray and GLF formed a fiduciary relationship, or a relationship of trust, between themselves and Khan**.**

98.     Desir, Timeless, Gray and GLF maintain complicated accounts related to Khan's earnings and their share of those earnings, requiring discovery of those accounts.

99.     Khan therefore requests an equitable accounting of all amounts provided to Desir, Timeless, Gray and GLF, or anyone acting on their behalf, obtained by those parties as a result of Khan's work, and for Khan to recover any amounts so due to him.

## Prayer for Relief

**WHEREFORE**, Khan respectfully requests this Court enter judgment in Khan's favor for the following

1.  Compensatory damages, to be proven at trial;

2.  Disgorgement of profits;

3.  Disgorgement of any amounts collected by any defendant to which they are not entitled;

4.  A declaration that Desir, Timeless and its agents Gray and GLF, are not entitled to any further amounts paid to or for the benefit of Khan, and that Khan is entitled to all amounts collected by Gray and GLF and that Khan is entitled to all amounts collected by Desir and Timeless that are greater than that set forth in the Timeless Agreement;

5.  An accounting of all amounts provided to Desir, Timeless, Gray and GLF, or anyone acting on their behalf, obtained by those parties as a result of Khan's work and due to Khan, and for Khan to recover all amounts due to him;

6.  Interest, attorney's fees and costs;

7.  Such other such relief as this Court may deem proper.

<u>Rule 38 Demand for Jury Trial</u>

Pursuant to Federal Rule of Civil Procedure 38, Khan hereby demands a trial by jury for

all claims so triable.


Dated: New York, New York
       July 6, 2021

                             GALLET DREYER & BERKEY, LLP

                             By:      <u>/s/ *Francelina Perdomo*</u>
                                     Francelina M. Perdomo, Esq. (*pro*
                                     *hac vice* motion forthcoming)
                                     fmp@gdblaw.com
                                     Kyle G. Kunst, Esq.
                                     kgk@gdblaw.com
                                     845 Third Avenue, 5th Floor
                                     New York, New York 10022
                                     (212) 935-3131


                                     Attorneys for Plaintiff
                                     *Adnan Khan, p/k/a Menace*

18

Exhibit C

## MANAGEMENT AGREEMENT

THIS AGREEMENT, made as of this _____ th day of
_____, 2015 by and between **Timeless Music
Entertainment, LLC, f/s/o Daniel Desir** ("Manager"), with an office at
_____ -and- **Adnan Khan**
individually, professionally known as "**Menace**" ("Producer") with an address at 16 Rivington
Street, OL120JU, Manchester, UK is made with reference to the following facts:

A.    Manager is a "personal manager" in the business of guiding and advising
various Producers in connection with their careers in the entertainment industry.

B.    Producer is a professional producer, mixer and engineer of musical audio and/or
audiovisual recordings.

C.    Producer now desires to obtain the counsel and advice of Manager in regard to
Producer's career as a professional producer, mixer and engineer of musical audio and/or
audiovisual recordings.  This is not an agreement for the exclusive services of Manager,
accordingly Producer acknowledges and agrees that (i) Manager's services hereunder shall
not be exclusive to Producer; (ii) Manager performs or shall perform the same or similar
services for others; and (iii) nothing contained herein shall prohibit Manager from providing
similar services for others or from engaging in other business activities during the Term (as
defined herein) of this Agreement.  Producer acknowledges, agrees, warrants and represents
that Producer shall not engage any other person, firm, or corporation (hereinafter "Person") to
render the same or similar services as Manager during the Term hereof.

D.    Producer has formed or may hereafter form one or more corporations for the purpose
of lending and exploiting Producer's services; wherever the term "Producer" is used herein, the
same shall be deemed to apply to any corporation, or other business entity owned or
controlled by Producer during the Term hereof and utilized in the entertainment industry for the
purpose of exploiting or lending Producer's services.

E.    Manager has advised Producer that Manager is not a "talent agency" and that
Manager is not licensed as such under the laws of the state of California or New York.  Manager
has advised Producer that except as provided otherwise by law, Manager is not permitted to seek
or obtain employment or engagements for Producer and that Manager does not agree to do so.
Manager has made no representations to Producer, either oral or written, to the contrary.  Producer
acknowledges that Manager does not hereby and has not offered to, attempted to or promised to
obtain, seek or procure employment or engagement for Producer, and that Manager is not
obligated to do so.

Accordingly, the parties hereby agree as follows:

**1.**        **Term:**  **(a)** The term of this Agreement ("Term") shall be for a period
commencing on the date hereof and shall extend for an initial period (the "Initial Period") of

1

approximately four (4) years.

        (b)    Following the Initial Period, Manager shall have one (1) separate option ("Option") to extend the Term for an additional period (the "Option Period") of one (1) year. Manager shall notify Producer of its intention to exercise such Option by written notice at any time prior to the expiration of the Initial Period.

**2.**    **Services:**  Manager shall advise, counsel and represent Producer with respect to decisions concerning employment, publicity, selection of projects and/or material, public relations and advertising, and all other matters pertaining to Producer's entertainment career an in all areas of same, including, but not limited to sound recordings (specifically, the production, engineering, mixing and editing of same), music publishing, personal appearances, product endorsements and merchandising/commercial exploitation of Producer's name and likeness.

**3.**    **Compensation:**

        (a)    Producer agrees that Producer will promptly pay a "Commission" to Manager in an amount equal to twenty (20%) percent of all Gross Monies (defined in subparagraph 3(b) below) received by or on behalf of Producer, or credited to Producer's account, during the Term or after the Term pursuant to paragraphs 3(b) and 3(d) below.

        (b)    "Gross Monies" as used herein shall mean any and all income received by Producer in connection with Producer's production, engineering, mixing, and editing services to be provided by Producer. Gross Monies shall also include any and all music publishing income received by Producer in connection with compositions written or co-written by Producer during the Term or within six (6) months following the Term ("Music Publishing Income"). Notwithstanding the foregoing, Gross Monies shall not include: (i) income earned or received from agreements entered into by Producer or compositions written or co-written by Producer prior to the Term of this Agreement; (ii) recording costs for recordings produced, engineered, mixed and/or edited by Producer; (iii) any income derived by Producer from companies, ventures or projects in which Manager has a proprietary interest; or (iv) any income earned or received by Producer from non-entertainment related agreements.

        (c)    (i)    Unless and until Producer designates a mutually-approved independent third-party business manager or certified public accountant to collect Gross Monies and render accountings and payments, all Gross Monies due to Producer shall be paid to and collected by Manager. Manager shall be entitled to retain its commission pursuant to the terms of this Paragraph 3 above, along with any "Management Expenses" incurred by Manager on Producer's behalf (pursuant to the terms of Paragraph 4 below), and shall remit the balance to Producer at the above address, together with a detailed accounting and appropriate documentation of "Management Expenses" (as defined in Paragraph 4 below) on a calendar quarterly basis during the Term.

        (ii)    If the Gross Monies are in fact received by an estate, corporation or other entity controlled by Producer or Producer's heirs, executors, administrators, representatives, successors and assigns (in this subparagraph "Producer's Affiliates"), then the payment to

Manager hereunder shall be measured by the Gross Monies received by such estate, corporation or entity, but in any event, only one payment arising out of any Gross Monies payable to Producer /or Producer's Affiliates shall be made to Manager.  However, it is specifically understood that compensation payable to third parties by Producer or Producer's Affiliates, including but not limited to compensation to agents, attorneys, accountants, booking or similar agencies or otherwise, shall not be deducted from Manager's share of Gross  Monies  as defined  herein,  nor  shall  such  third  party compensation otherwise affect Manager's compensation hereunder.  Manager shall be deemed to have earned Manager's Commission simultaneously with the payment to Producer or Producer's Affiliates of Gross Monies, and Manager's Commission will be treated as and held in a constructive trust by Producer or Producer's Affiliates for Manager, and paid, as aforesaid, not more than thirty (30) days after receipt by Producer or Producer's Affiliates of such Gross Monies.

> (iii)     Each party hereto shall maintain accurate books and records of all transactions concerning Producer, which books and records may be inspected by a certified public accountant, attorney or business manager designated by the other party, no more than twice each calendar year, upon reasonable prior written notice to such other party, at the office where such books and records are kept, during regular business hours.  Upon written notice by either party to the other, the party to whom such notice is addressed shall furnish an accounting to the other party of all transactions between the parties since the last such accounting, within thirty (30) days of such request; provided, however, that neither party shall be obligated to account to the other more than twelve (12) times in any one (1) year period.

> (d)     Manager's participation in Gross Monies received after the Term (including Music Publishing Income) which is derived from agreements entered into, services performed, or compositions written or co-written by Producer during the Term or within six (6) months thereafter, shall continue for a period of five (5) years following the expiration or termination of the Term hereof ("the Post-Term Period"), except that Manager's commission during the Post Term Period shall be reduced as follows:

| Post-Term Year | Manager's Commission |
|---|---|
| 1 | 15.0 |
| 2 | 10.5 |
| 3 | 7.0 |
| 4 | 5.0 |
| 5 | 2.5 |

**4.     Manager Expenses:**     Manager shall be reimbursed for all "Management Expenses" (all expenses incurred on behalf of Producer in direct connection with Producer's professional career or in connection with the performance of Manager's services hereunder, including, but not limited to, messenger, delivery, photocopy, postage, local and long distance telephone and related charges, including, but not limited to, any charges which are requested or approved by Producer, but excluding Manager's normal  office  operating  expenses.) Management Expenses shall not exceed Five Hundred (US $500.00) US Dollars for any single expense or Seven Hundred Fifty (US $750.00) US Dollars per month without the prior written

consent of Producer.

**5.      Warranties and Representations:**

(a)      Producer warrants, represents and agrees that:

(i)      Producer is not under any disability, restriction or prohibition, either contractual or otherwise, with respect to Producer's right to execute this Agreement or to fully perform its terms and conditions;

(ii)      As of the date hereof Producer has attained the age of eighteen (18) years; and

(iii)      Producer has the full right, power and authority to use the names "Menace," and to do business thereunder, and Manager's activities on Producer's behalf under this Agreement will not infringe upon, violate or interfere with the rights, whether statutory, or otherwise, of any one or more third parties.

(b)      Manager warrants, represents and agrees that Manager is not under any disability, restriction or prohibition, either contractual or otherwise, with respect to Manager's right to execute this Agreement or to fully perform its terms and conditions.

**6.      Indemnification:**   Producer and Manager agree to and do hereby indemnify, save and hold each other harmless from all loss, damage and expenses (including reasonable attorney's fees) arising out of or connected with any claim which shall be inconsistent with any agreement, warranty or representation made by Producer or Manager in this Agreement. Producer and Manager agree to reimburse the other party, if and when applicable, on demand, for any payment made at any time after the date hereof with respect to any liability to which the foregoing indemnity applies.

**7.      Assignment:**   Notwithstanding anything to the contrary in this Agreement, Manager shall have the right to assign this Agreement to any person with which Manager is merged or which Manager now or hereafter owns, acquires or controls, in whole or in part, or in which Manager acquires a controlling interest or which acquires a controlling interest in the assets of Manager.   Producer shall not have the right to assign this Agreement, or any of Producer's rights hereunder, without Manager's prior written consent, except to a wholly-owned, loan-out corporation formed by Producer to provide Producer's services.   Notwithstanding the foregoing, Producer shall be entitled to assign his right to receive income hereunder to any third parties, subject to Manager's rights pursuant to this Agreement.

**8.      Cure:**   No failure by either party hereto to perform any of its obligations hereunder shall be deemed a material breach of this Agreement until the other party gives such non-performing party written notice of its failure to perform, and such failure has not been corrected within thirty (30) days from and after the service of such notice, or, if such breach is not reasonably capable of being cured within such thirty (30) day period, such non-performing

party does not commence to cure such breach within said time period, and proceed with reasonable diligence to complete the curing of such breach thereafter.

**9.     Independent Counsel:**  Each of the parties hereto warrant and represent that in executing this Agreement (a) they have relied solely upon their own judgment, belief and knowledge and the advice and recommendations of their own independently selected and retained counsel, concerning the nature, extent and duration of their rights and claims, and that they have not been influenced to any extent whatsoever in executing this Agreement by any representations or statements with respect to any matters made by any party or representative of any party; or (b) they have intentionally refrained from doing so and have knowingly and voluntarily waived such right.

**10.     Notices:**  All notices pursuant to this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested (prepaid) at the respective addresses hereinabove set forth or such other address or addresses as may designated by either party.   Such notices shall be deemed given when mailed, except that a notice of change of address shall be effective only from the date of its receipt.  A copy of all such notices sent to Manager shall be sent to the address above.

**11.     Miscellaneous:**

(a)     Producer acknowledges and agrees that Manager's right to represent Producer jointly regarding services within the entertainment industry and Producer's obligation to solely and exclusively use Managers in such capacity are unique, irreplaceable and extraordinary rights and obligations and that any breach or threatened breach by Producer thereof may be material and shall cause Manager immediate and unavoidable harm to its Manager's reputation and goodwill in the entertainment industry, and other immediate and unavoidable harm which cannot be adequately compensated for by a money judgment. Accordingly, in the event of any such breach, actual or threatened, Manager shall have, in addition to any other legal remedies, the right to seek injunctive or other equitable relief.

(b)     This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof.   No modification, amendment, waiver, termination or discharge of this Agreement or any provision hereof shall be valid unless confirmed by a written instrument executed by both parties.  A waiver by either party of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.  If any part of this Agreement shall be determined to be invalid, unenforceable or illegal by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, the remainder of this Agreement shall remain in full force and effect and such illegality or unenforceability shall not affect the validity of the remaining portions and

AMGMGT-2015-Menace-NG

provisions hereof.

        (c)    This Agreement has been entered into in the State of New Jersey, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New Jersey without regard to any conflict of laws principles.  The courts located in the State and County of Passaic will have exclusive jurisdiction of any controversies regarding this Agreement; and any action or other proceeding which involves such a controversy will be brought exclusively in the courts located within the State and County of Passaic; provided, however, if Manager is sued or joined in any other court or forum in respect of any matter which may give rise to a claim by Manager hereunder, Producer consents to the jurisdiction of such court or forum over any such claim which may be asserted by Manager.  Any process in any action or proceeding commenced in the courts located in the State and County of Passaic arising out of any such claim, dispute or disagreement, may, among other methods, be served upon Producer by delivering or mailing the same, via registered or certified mail, addressed to Producer at the address first above written or such other address as Producer may designate by proper notice hereunder.

        IN WITNESS WHEREOF, the parties hereunto set their hands as of the date first above written.

**PRODUCER:**                            **Timeless Music Entertainment, LLC.**

By: _____      By:_____
     Adnan Khan                       Timeless Music Entertainment, LLC
     Professionally known as "Menace"     f/s/o Daniel Desir
     Social Security No.: ____-___-____

# Exhibit D

THIS AGREEMENT is made the _____ day of  April 2016

BETWEEN:

**Adnan Khan (professionally known as "Menace")** care of The Gray Law Firm, LLC, 254 State Street, Hackensack, New Jersey, 07601, USA( "the Writer"); and

**STELLAR SONGS LIMITED** care of OJK, 19 Portland Place, London, W1B 1PX, United Kingdom ("the Publisher" – which expression shall include  its successors in title and permitted assigns)

WHEREAS:

(1)     The Writer is a composer of music and/or author of lyrics of musical compositions; and

(2)     The Publisher is engaged in the business of music publishing and has, inter alia, facilities for the administration, promotion and exploitation of musical works;

NOW IT IS HEREBY AGREED as follows:

1.   DEFINITIONS

In this Agreement the following terms shall have the following meanings:

(a)     "Advances" – sums paid by the Publisher to the Writer as non-returnable payments recoupable from royalties payable to Writer pursuant to this Agreement.

(b)     "Compositions" - all the musical and literary works (including but not limited to the titles, words, lyrics, music, libretti and musical scores, thereof and all interpolations, collections, compilations and all arrangements, adaptations, versions, editions and translations thereof) written and/or composed in whole or in part by the Writer (whether alone or with others) prior to or during the Term to the extent of the Writers contribution thereto including, without limitation, all musical and literary works:

(i)     written and/or composed prior to the date hereof (including without limitation those listed in Part I of Schedule A hereto) and not previously licensed or assigned to a bona fide third party as listed in Part II of Schedule A hereto or (if they have been licensed or assigned to a third party) the rights in which revert to the Writer during the Term; and/or

(ii)      written and/or composed during the Term; and/or

(iii)     commenced during the Term and completed within 3 months after the expiry or termination of the Term.

Musical compositions written by third parties which are acquired by Writer during

the Term shall not be Compositions.

(c) "Cover" a recording of a Composition procured by the direct efforts of the Publisher or any of its sub-publishers, which shall include recordings of Compositions resulting from a writing collaboration introduced to Writer by the Publisher.

(d) "the Publisher's Share" - the original combined publishers share and sub-publishers share of performing fees customarily paid by performing right societies to the publishers but not less than six-twelfths (6/12) of gross performing fees less normal society commissions or fees.

(e) "Rights Period" - in relation to each Composition the Term of this Agreement and any extension thereto together with the period specified in Clause 2(c) hereof.

(f) "Term" - the period referred to in clause 2.

(g) "Territory" - the Universe.

(h) "the Writer's Share" - the share of performing fees customarily paid by performing right societies directly or indirectly to composers and authors but not more than six twelfths (6/12) of gross performing fees less normal society commissions or fees.

2.   TERM AND RIGHTS PERIOD

(a) The Term of this Agreement shall commence on the date hereof and continue until the later of:

(i) the date 3 years after commencement; or
(ii) (subject to sub-clause 2(b) below) the date of recoupment of all Advances paid to the Writer pursuant to this Agreement.

(b) With effect from the date four (4) years after commencement of the Term, Writer shall be entitled to terminate the Term upon payment to Publisher of a sum equal to 134% of the unrecouped balance on the Writer's royalty account.  Publisher shall notify Writer of the unrecouped balance upon request.  Thereafter, Publisher shall credit 75% of the sum paid by the Writer to Writer's royalty account and shall retain the balance of such sum for Publisher's own benefit.

(c) Notwithstanding the expiry or termination of the Term all rights title and interest of the Publisher in and to each and all of the Compositions shall remain with and belong to the Publisher until the later of:

(i) twelve(12) years after the expiration or termination of the Term; or

(ii) the earlier of recoupment of all advances paid to Writer pursuant to this Agreement or the date fifteen (15) years after expiration or termination of the Term

If the rights of the Publisher in the Compositions would terminate on a date other

than 30th June or 31st December in any year then the rights of the Publisher therein shall be extended until the next following such date.

(d)     It is expressly understood between the parties that the Publisher shall have the right to collect on the Writer's behalf all income derived from the use or exploitation of the Compositions in the Territory during the Rights Period and prior thereto even if such monies are collected by the Publisher or paid to the Writer within a period of two (2) years after the expiry of the Rights Period.  In the event and notwithstanding the expiry of the Rights Period hereunder the Publisher shall continue through no fault of the Publisher to receive fees and royalties in respect of the Compositions the Publisher shall account to the Writer in respect thereof as provided herein.

(e)     Notwithstanding anything to the contrary contained herein upon the expiration of the Rights Period all rights and interest in the Compositions granted hereunder to the Publisher shall revert to the Writer without further formality Except That the Publisher shall have the non-exclusive right to distribute and sell and authorize the further distribution and sale of any printed editions then printed by the Publisher containing solely Compositions during the period of one (1) year following the expiry of the Rights Period and subject always to Clause 2(d) above.  In respect of mixed folios containing Compositions together with other musical works the Publisher shall have the non-exclusive right to sell such folios for the full period of time as the same may be published by the Publisher, its sub-publishers and licensees.  The Publisher shall account to the Writer for royalties in accordance with clause 6(a)(i) of this Agreement in respect of sales of printed editions or mixed folios following expiry of the Rights Period.

3.   AVAILABILITY OF COMPOSITIONS

(a)     The Writer hereby agrees to write and/or compose Compositions exclusively for the Publisher during the Term and shall advise the Publisher promptly in writing of each Composition available to the Publisher pursuant to this Agreement.  The Writer shall supply to the Publisher full copyright information relating to each Composition including, but not limited to, the full name of the writer(s) and their society affiliation, the share of each Composition attributable to each writer, the share of each Composition controlled by the Writer and the proportion of royalties derived from each Composition claimable by the Publisher hereunder.

(b)     The Writer shall send to the Publisher at the Writer's expense one (1) demonstration recording of each Composition and (upon Publisher's reasonable request) one (1) lead sheet of each such Composition within fifteen (15) days of first recording of the Composition.  The Writer shall also promptly notify the Publisher of the release dates of the Composition if known to the Writer and supply to the Publisher at the Writer's expense two (2) copies of each "single" record or "long play" record of each available Composition.  If the Writer fails to supply such copies or lead sheets the Publisher shall have the right to demand the same from the Writer and, if the Writer fails to supply them within ten (10) days of request, Publisher may do so at the expense of the Writer and to invoice the Writer therefore or, at the Publisher's election, to debit the Writer's royalty account hereunder.

(c)     The Writer shall prior to the collaborating with any other person in the writing or composition of any of the Compositions advise such other person of the exclusive nature of the Writer's services hereunder.

## 4.   RETURN OF COMPOSITIONS

(a)     The Publisher undertakes to use its reasonable endeavours to exploit and administer Compositions delivered to the Publisher hereunder.  In the case of any Composition specially written for inclusion in a film the Publisher undertakes to use all reasonable endeavours to exploit such Composition by means additional to the inclusion of the Composition in the soundtrack of the film for which it was commissioned and the public performance or broadcasting of the film in question or its inclusion in a cable programme service.

(b)     Notwithstanding anything herein contained, if, in the case of any Composition there has not taken place in any part of the Territory at any time before the expiry of a period of two (2) years after the termination or expiration of the Term of this Agreement:

     (i)      the grant of a licence for a recording of such Composition (or a substantial part thereof) for the purpose of reproducing the same on a record or other sound bearing contrivance and/or visual image producing contrivance or device for sale to the public; or

     (ii)     the publication of such Composition in printed form in reasonable commercial quantities for sale to the public, including the preparation and editing of the work for use in a hire library; or

     (iii)    the grant of a licence for the synchronisation of such Composition with any cinematograph film, television film or production, video cassette or disc or any other visual image producing device in return for a fee of at least one hundred US dollars ($100); or

     (iv)    a public performance of such Composition, including but not limited to a broadcast by radio or television or other streaming or diffusion service.

then the Writer shall be entitled to give notice in writing to the Publisher at its registered office by registered post within a period of six (6) months from the date of the expiry of the said period.

(c)     If none of the uses referred to in paragraphs (b)(i) to (b)(iv) inclusive above takes place in any country or territory of the Territory in respect of such Composition within a further period of six (6) months from the date of receipt of such notice by the Publisher, then as the Writer's sole remedy the Writer shall be entitled at the expiry of such further period of six (6) months to demand by notice in writing as above that the Publisher re-assign to the Writer all rights hereby assigned to the Publisher in respect of such Composition.  The Publisher shall thereupon execute such assignment and the Writer shall have no further claim whatsoever against the Publisher in respect of such Composition save for the obligation to account in accordance with clause 7 below.

(d)     Re-assignment pursuant to this Clause shall be subject to all rights in such Composition for any territory outside the United Kingdom as may have been vested by the Publisher in unrelated parties by virtue of any sub-publication agreement made before the date of receipt of such notice by the Publisher.  The Writer shall, however, be entitled to receive all royalties earned by such Composition under such agreement (other than the sub-publisher's share) after the date of such re-assignment.

## 5.   ASSIGNMENT OF COPYRIGHT

In consideration of the mutual promises herein set out and other valuable consideration (receipt of which is hereby acknowledged) the Writer hereby grants and assigns to the Publisher with full title guarantee during the Rights Period all present and future copyright or similar right and all rights, title and interest of the Writer in the Compositions of whatsoever nature (subject only as hereinafter expressly provided) and all extensions and renewals thereof throughout the Territory including, but not limited to:

(a)  the exclusive right to licence third parties to print publish distribute hire and sell printed copies of the Compositions;

(b)  the exclusive right to grant licences to allow others to record transcribe and otherwise mechanically or electronically record to reproduce the Compositions whether with or without visual images and other reproduction rights in and for the Territory;

(c)  the exclusive right to licence performance of the Compositions publicly within the Territory including without limitation "grand rights" and radio and television performances;

(d)  the exclusive right to grant licenses for the recording and synchronisation of the Compositions in and with films tapes and other permanent visual images for the Territory or any part thereof for the full period of copyright in the Compositions and to make copies of the recordings thereof and to collect all income arising therefrom, whenever received, subject to the terms hereof.

(e)  the exclusive right to make orchestral and other arrangements and adaptations of the Compositions, to procure any new or translated lyrics or titles thereof, and to publish sell or use the Compositions and to authorize others to do so in the Territory, either with or without any such arrangement adaptation new lyric or translation thereof Except That subject always to the rules of any collection society the Publisher shall not make any adaptation of or material alteration to any Composition without the Writer's prior consent (such consent not to be unreasonably withheld or delayed).  The copyright in all such new matter (including any translations) shall (as between the Writer and the Publisher) be the property of the Writer and assigned to the Publisher for the Rights Period.  The remuneration of such arrangers adaptors and translators shall be governed by the rules of performing right societies, mechanical right societies, or other collection agencies to which they or the Publisher or the Publishers agent or licensee shall belong.  If no such rules apply then their remuneration shall be at the Publisher's reasonable good faith discretion after consultation with the Writer taking into

account industry practice in the country concerned;

(f)    the exclusive right to grant licences or enter into contracts authorizing the broadcast, transmission or other uses of the Compositions in the Territory by any and all means now known or hereafter devised, subject to the rights of the appropriate performing right societies in respect thereof;

(g)    the exclusive right to grant licenses or enter into contracts authorizing the transfer and/or exploitation of all rental and lending rights accruing pursuant to the 1996 Copyright and Related Rights Regulations and any amendments thereto and/or subsequent legislation in respect thereof;

(h)    the non-exclusive right to use the names (including professional name) approved photographs approved likenesses approved autographs facsimiles and approved biographical material of the Writer in connection with the Compositions and in reasonable publicity for the Publisher;

(i)    the exclusive right to collect one hundred per cent (100%) of any fees royalties and monies attributable to the use of the Compositions in the Territory prior to or during the Rights Period including, but without limitation of the foregoing the right to collect and receive one hundred per cent (100%) of the Publisher's and the Writer's mechanical fees and all monies arising as a result of any claim in respect of the Compositions Except That there shall be specifically excluded from such right the right to collect the Writer's Share of public performance fees where such right has been granted to any performing right society.  It is understood and agreed between the parties that the Publisher shall have the right to collect income earned throughout the Territory from all uses of the Compositions;

(j)    the exclusive right to make claims and take legal proceedings in respect of any infringement of the copyright in the Compositions or the unauthorized use or exploitation of the Compositions prior to the date of this Agreement; and

(k)    the exclusive right to exercise all other rights in respect of the Compositions which are not specifically referred to herein whether now existing or hereafter created, and to use and exploit the Compositions by all existing and any as yet undiscovered methods.

6.   ROYALTIES

(a)    In consideration of the grant and assignment hereunder of the rights in the Compositions, the Publisher undertakes to pay to the Writer during the Rights Period (and after the Rights Period pursuant to clauses 2(d) or 2(e)) the royalties specified in sub-clauses (a) and (b) of this Clause which have been received by or credited to the Publisher in the United Kingdom direct from third parties or from its sub-publishers or licensees from the use and/or exploitation of the Compositions in the Territory:

(i)    seventy five percent (75%) of all monies resulting from licensing third parties to publish print copy or otherwise graphically reproduce the

6

Compositions;

(ii)     seventy five percent (75%) of all fees and royalties arising from mechanical and/or electrical reproduction rights;

(iii)    fifty percent (50%) of the Publisher's Share of public performance fees and royalties received by the Publisher from performing right societies;

(iv)    seventy percent (70%) of all synchronisation fees, other than in respect of synchronisations procured by the Publisher;

(v)     with respect to all uses of the Compositions other than those specifically referred to in this sub-clause seventy five percent (75%) of all fees and royalties;

(b)     In respect of each Cover of a Composition, in lieu of the royalty rates specified in sub-clauses 6(a)(ii) and 6(a)(iv) above the Publisher shall pay to the Writer a royalty of seventy per cent (70%) of the monies or fees arising from such Cover:

(c)     The royalties provided for above shall be computed upon one hundred per cent (100%) of gross monies received by or credited to the Publisher or the Publisher's sub-publishers "at source" directly and identifiably attributable by title to the exploitation of the Compositions less only:

(i)     standard commissions actually retained by performing rights societies and/or mechanical rights collection agencies or other collection agencies;

(ii)    VAT or any other taxes required to be deducted in any part of the Territory; and

(iii)   any amounts paid by way of remuneration to arrangers adaptors and translators in accordance with the provisions of this Agreement.

(d)     The grant of performing rights with respect to the Compositions is expressly made subject to the rights of and the agreements with the performing right society of which the Writer is (or may become) a member as such rights now exist and as they hereafter may be extended.  The performing right society shall collect all public performance fees and royalties earned in the Territory in respect to the Compositions and shall pay the Writer's Share of such fees and royalties directly to the Writer and the Publisher's Share of such fees and royalties directly to the Publisher.  If the Publisher or its agent or licensee does not receive in any part of the Territory the Publisher's Share of the total public performing fees and 100% of all other fees and royalties resulting from the use and/or exploitation of the Compositions in the Territory for any reason other than the Publisher's agreement with its sub-publishers/licensees or any act or omission by them then the proportion of such fees and royalties payable by the Publisher to the Writer hereunder shall be correspondingly reduced, so that the Publisher shall in any event receive and retain the same proportion of all fees and royalties which the

7

Publisher would have received and retained pursuant to paragraphs (a) and (b) of this clause if the Publisher had received the Publisher's Share of the total public performing fees and 100% of all other fees and royalties as aforesaid; Further more if the fees and royalties remitted to the Publisher are reduced as aforesaid by reason of the Writer's agreement with any collection society or agency (such as by way of example BIEM) or by reason of local legislation then in addition to the reduction in fees and royalties referred to above all advances subsequently payable to the Writer hereunder shall be correspondingly reduced by the proportion of the Publisher's Share of the total performing fees and 100% of all other fees and royalties which the Publisher is unable to receive.

(e)     If the Writer is not a member of a performing right society then the performing right in the Compositions shall belong to and be administered wholly by the Publisher who shall be entitled to collect the full amount of the performing fees on behalf of the Writer and the Publisher.  If the Publisher shall receive the entire performing fees (i.e. the Writer's Share and the Publisher's Share) the Publisher shall account to the Writer for the Writer's Share of such performing fees without deduction and irrespective of recoupment of advances paid to the Writer until such time as the Writer shall become a member of a performing right society.

(f)     The Writer shall collaborate with the Publisher and shall use best commercial endeavours to procure that the Writers and/or composers of the Compositions shall collaborate with the Publisher in giving all necessary instructions to the performing right societies mechanical right societies or other collection agencies, as the case may be, concerning the agreed divisions of fees and royalties hereunder and the payment thereof.

(g)     No fees or royalties shall be paid to the Writer in respect of any professional or complimentary copies of the Compositions (whether printed music editions mechanical reproductions in newspaper articles, magazines, periodicals or otherwise) or orchestral or band parts or copies sold at or below cost distributed in reasonable numbers to promote the exploitation of Compositions hereunder.

(h)     All sums payable to the Writer shall be subject to the deduction or withholding of income taxes or other taxes required to be deducted or withheld under the laws of any part of the Territory, and if the laws of any country require taxes on such payments to be withheld at source then the royalties that accrue to the Writer hereunder shall be reduced proportionately.  The Publisher shall supply to the Writer a tax deduction certificate for any withholding tax that the Publisher is required to deduct in the United Kingdom.  If the Publisher receives a tax credit in respect of taxes withheld on monies arising from exploitation of the Compositions outside the United Kingdom, the Publisher shall credit to the Writer's royalty account an amount equal to the Writer's appropriate royalty share of such tax credit.

(i)     In the event the Publisher is unable to receive any royalties from any country in the Territory as a result of any law, government ruling, currency or other restriction, then any share of such royalties which is properly due to the Writer hereunder and can be paid in the said country may at the Writer's request and sole expense be deposited in foreign currency in an account selected by the Writer in the country of the Territory from which the Publisher is unable to receive

8

royalties as aforesaid subject to the laws of such country and of England, and payment so deposited shall fulfil the Publisher's obligations hereunder as to royalties payable to the Writer.

## 7.   ADVANCE PAYMENTS

(a)     The Publisher agrees to pay to the Writer during the Term of this Agreement the following non-returnable advance payments on account of fees and royalties payable to the Writer hereunder:

   (i)     Seven hundred thousand US dollars (US$700,000) within seven (7) days following full execution of this Agreement;

   (ii)    Thirty-five thousand US dollars (US$35,000) at the Writer's direction and on the Writer's behalf, to The Gray Law Firm LLC within seven (7) days following full execution of this Agreement;

   (iii)   Seven hundred thousand US dollars (US$700,000) within seven (7) days following the earlier of recoupment of the advances paid to Writer pursuant to sub-clause 8(a)(i) and 8(a)(ii) above; and

   (iv)    Thirty-five thousand US dollars (US$35,000) at the Writer's direction and on the Writer's behalf, to The Gray Law Firm LLC at the same time as payment of the advance pursuant to sub-clause 8(a)(iii) above.

(b)     All monies (other than fees and royalties credited to the Writer's royalty account hereunder) which are paid during the Term of this Agreement by the Publisher to the Writer or which are, at the written request of the Writer, paid by the Publisher to third parties on behalf of the Writer shall be deemed to be advance payments on account of fees and royalties payable to the Writer hereunder, unless the Publisher shall have expressly agreed to the contrary in writing.  The Publisher shall not pre-pay any advances without the written permission of the Writer.

(c)     All advances shall be recoverable by the Publisher out of any and all fees and royalties (but not Advances or the Writer's Share of performance income) at any time payable to the Writer pursuant to this Agreement.

(d)     In the event of the termination of the Term of this Agreement in accordance with Clause 15(b)(ii) hereof no further advance payments shall be payable to the Writer hereunder other than those accrued due prior to such termination.

(f)     For the avoidance of doubt it is hereby expressly acknowledged and agreed that the Publisher has the sole and exclusive right to collect all income (excluding the Writer's Share) arising during the Rights Period and/or prior thereto in connection with the exploitation of all rental and/or lending rights in the Compositions.  To the extent that the aforesaid right to collect such income cannot be assigned or transferred to the Publisher, the Writer hereby appoints the Publisher as its exclusive agent to collect such income as aforesaid.  It is acknowledged and agreed that the remuneration specified herein is full and final compensation for the rights granted to the Publisher hereunder and that such remuneration includes full and sufficient reasonable and equitable remuneration for all rental

9

and lending or other rights granted to the Publisher its licensees and successors in title.

8.   ROYALTY ACCOUNTS

(a)      True and correct royalty accounts shall be kept by the Publisher in respect of the Compositions and shall be maintained in the currency of account of the Publisher.  Royalty statements shall be prepared by the Publisher in respect of each accounting period as at the 30th June and 31st December in each year and shall show all monies received by the Publisher and processed and computed as being due under this Agreement. Such statements shall be mailed on or before the 30th September and 31st March respectively after the end of each accounting period together with a remittance by the Publisher to the Writer of all sums thereby shown to be due, the rate of exchange (if applicable) being that prevailing at the date when the relevant payment is made to the Publisher.  Such statements shall specify, inter alia, the nature and source of all such monies and any returns.  No statements will be prepared or payments made where the total sum due is under £100 and such amounts will be carried forward to the next following accounting statement.

(b)      Not more than once in each year (and subject to making a convenient prior appointment) the Publisher shall permit the Writer's representative (who shall be an independent qualified local accountant not simultaneously engaged in an audit of the Publisher's royalty accounts and statements on behalf of a third party) to audit the relevant parts of all royalty accounts and statements of the Publisher insofar as the same relate to the Compositions hereunder and to make copies of the relevant excerpts.  Such representative shall not conduct such audit on a contingency basis.  Any such audit shall take place during normal business hours at the location where such accounts and statements of the Publisher are maintained and shall be at the sole expense of the Writer EXCEPT THAT if any such audit proves an underpayment to the Writer of ten per cent (10%) or more of monies properly payable to the Writer (being at least £10,000), the Publisher shall reimburse to the Writer the reasonable costs of such audit (excluding travel and subsistence) up to a maximum of £5,000. Such audit may not be made more than once with respect to any particular statement.

(c)      In the event that the Writer's representative as aforesaid carries out such an audit it shall provide the Publisher not less than thirty (30) days prior to such audit with a full list of the titles and writers of all Compositions in respect of which the audit is to be conducted.  The Writer acknowledges that the documents made available for audit contain confidential commercial information and neither the Writer nor his representative will disclose (other than to its professional advisers or as required by law) or use on behalf of any third party any facts or information obtained as a result of any such inspection.  After completion of the audit the Writer shall provide the Publisher with a full copy of any draft and/or final report resulting therefrom and the Writer and his representative shall discuss such report with the Publisher with a view to correcting any errors or questions arising therefrom.

(d)      Any royalty statement or payment submitted by the Publisher to the Writer and unaudited by the Writer within three (3) years from the date of issue thereof shall

be deemed accepted by the Writer.

(e)     If the Publisher, or any third party on behalf of the Publisher, makes an overpayment to the Writer, the Writer shall immediately repay such overpayment to the Publisher upon demand.

9.  WARRANTIES

(a)   The Writer hereby warrants and represents that:

(i)     the Writer has full right, power and authority to enter into this Agreement and to grant to the Publisher the rights hereinabove set forth upon the terms and conditions contained herein;

(ii)     the Compositions and all parts thereof including the words and music are and will be in the ownership of the Publisher during the Rights Period.

(iii)    the Compositions and all parts thereof including the words and music are and will be unencumbered and original copyright works;

(iv)    the Compositions are and will be neither criminally obscene nor defamatory and do not and will not infringe the copyright or other rights of any third party;

(v)     there is no suit, claim, action or other legal or administrative proceeding involving the Writer, the Compositions or the writers and/or composers thereof now pending or threatened nor any basis therefor;

(vi)    the Writer has not performed nor will the Writer perform any act or thing which will in any way, directly or indirectly, act to diminish or deprive the Publisher of any rights herein granted;

(vii)    the Writer will become a member of  one or more of PRS, ASCAP, BMI, or SESAC and the Writer hereby agrees that this Agreement shall be regarded as a certificate authorizing such society or societies to treat the Publisher as exploiting the Compositions for the benefit of the persons interested therein; and

(viii)   the Writer has not collected or authorized any third party to collect any monies arising from exploitation of Compositions prior to the date of this Agreement.

(b)     The Writer hereby acknowledges that the Publisher has advised the Writer to take independent legal advice from a lawyer specializing in the music business on the terms and conditions of this agreement and on the implications of the Writer executing it.  The Writer hereby warrants that the Writer has taken such independent legal advice and is accordingly satisfied that the agreement is for the Writer's benefit.

(c)     The Writer undertakes to pay any and all fees, royalties and other sums due from the Writer to any other writers and/or composers of the Compositions (including

personal representatives, heirs, successors and assigns) or due from the Writer to any other third party in respect of the Compositions.

(d)     The Writer undertakes to acknowledge, execute and deliver, or cause to be acknowledged, executed or delivered, all such further instruments or documents and to perform, or cause to be performed, all such further acts as the Publisher may reasonably deem necessary or desirable to give effect to the terms and provisions of this Agreement.

(e)     The Writer hereby grants to the Publisher an irrevocable power of attorney coupled with an interest in respect of the Compositions authorizing the Publisher its successors and assigns to file applications to secure copyright registration and renewals of copyright registration of the Compositions in the name of the Publisher under any applicable law now in effect or hereafter enacted and to renew and extend the copyrights in the Writer's name and on the Writer's behalf and upon the issue of such renewal to execute assignments thereof in the Writer's name so as to secure to the Publisher for the duration of the Rights Period the copyright in the Compositions and all renewals and extensions thereof (subject to the terms of this Agreement).

(f)     The Writer represents and warrants that subject always to the Writer's membership of PRS, ACSAP, BMI and/or SESAC the Writer has not granted and will not during the Rights Period grant any rights in the Compositions or any of them to any person firm or company other than the Publisher or enter into any agreement or act in any way which would derogate from the rights granted to the Publisher hereunder.  Without limitation to the generality of the foregoing the Writer has not entered into nor shall the Writer after the date hereof enter into any agreement in respect of the Writer's recording or other services or in respect of recordings or other exploitation of the Compositions or any of them which seeks either to reduce the amounts payable to the Publisher by record companies or other third parties in any part of the world to less than the statutory rate (or customary rate where no statutory rate exists) for any particular territory in the world or to limit the Publisher's ability to negotiate such rates in any way whatsoever without the Publisher's prior written consent.  It is understood that it shall be reasonable for the Publisher to withhold its consent if the effect of giving it would be to reduce sums payable to the Publisher. If the Publisher agrees to accept a reduced amount as aforesaid, the Publisher shall not seek to recover such amount from the Writer.   For the avoidance of doubt it is hereby agreed that in the event that any rate prescribed by statute in any territory of the world should cease to be so prescribed then such rate shall not be less than the rate in force immediately prior to such abolition save that in the United Kingdom the Publisher shall not be obliged to grant a licence at a rate less than the rate imposed by the copyright tribunal unless and until such time as agreement is reached between the BPI and MCPS.

(g)     The Writer agrees to and does hereby indemnify save and hold the Publisher harmless from any and all loss and damage (including reasonable attorney's fees and costs) arising out of or connected with any breach of any of the warranties representations covenants or agreements made by the Writer in this Agreement and the Writer agrees to reimburse the Publisher on demand for any payment made by the Publisher at any time after the date hereof with respect to any

liability or claim to which the foregoing indemnity applies provided such payment is made pursuant to a court order or pursuant to a settlement approved by the Writer (such approval not to be unreasonably withheld or delayed).

(h)    The Publisher hereby warrants and represents that the Publisher has full right, power and authority to enter into this Agreement.

(i)    The Publisher agrees to and does hereby indemnify save and hold the Writer harmless from any and all loss and damage (including reasonable attorney's fees and costs) arising out of or connected with any breach of any of the warranties representations covenants or agreements made by the Publisher in this Agreement and the Publisher agrees to reimburse the Writer on demand for any payment made by the Writer at any time after the date hereof with respect to any liability or claim to which the foregoing indemnity applies provided such payment is made pursuant to a court order or pursuant to a settlement approved by the Publisher (such approval not to be unreasonably withheld or delayed).

## 10.  COPYRIGHT NOTICE

The Publisher shall print or cause to be printed on the outside cover or title or first page of music of every printed copy of the Compositions published by or under the control of the Publisher pursuant to this Agreement a proper notice of copyright in such form as may be required by the laws of the respective countries within the Territory and any international conventions pertaining to the acquisition and/or preservation of copyright in the Compositions.

## 11.  SUB-PUBLISHING

(a)    The Publisher shall be entitled to sub-publish or licence to any third party or to authorize or permit any third party to exercise any or all of the rights of the Publisher hereunder in the Compositions in the Territory or any part thereof.  The Publisher shall, however, remain primarily liable to the Writer for the payment of the royalties and fees referred to in Clause 6 hereof, unless the Writer otherwise consents in writing.

(b)    The Publisher confirms that its sub-publisher's shall be obliged to account to the Publisher no less frequently than twice per year.

## 12. SAMPLES

(a)    In respect of each written request for the use of so-called sampled extracts from any of the Compositions which is received by the Publisher during the Term and prior to release of the relevant new work the Publisher shall not authorize such use without the Writer's approval (such approval not to be unreasonably withheld or delayed) provided it is within the Publisher's control to withhold its consent.

(b)    In the event that the Writer prior to the date hereof and/or hereafter includes in any musical work comprising a Composition so-called sampled extracts from musical works and/or any literary or other copyright works ("Samples") then the Writer will promptly furnish to the Publisher a fully itemised and detailed list in the form set out at Schedule B hereto together with a listening tape recording copy

13

for the Publisher's reference of all Samples included therein with details of the owners thereof and their licensees and a copy of every clearance agreement (if any) and correspondence with such owners and licensees (if any) and the identity of the recordings and musical works concerned.

(c)     Notwithstanding anything to the contrary in the Agreement the Writer hereby fully indemnifies the Publisher against any and all claims alleging the use of Samples including reimbursement of all costs damages and awards including reasonable legal fees and litigation costs and the Publisher shall be entitled to deem such costs damages and awards paid or incurred by the Publisher further non-returnable advances fully recoupable by the Publisher from any and all royalties payable to the Writer pursuant to the Agreement, and in addition, at the Publisher's election, deductible from any and all advance payments becoming due to the Writer pursuant to the Agreement.

## 13.  LEGAL PROCEEDINGS

The Writer irrevocably authorizes, empowers and vests in the Publisher the right but not the obligation to enforce and protect all rights in and to the Compositions and the copyright therein in the Territory, whether standing in the name of the Writer or the Publisher or otherwise.  The Publisher may, in its sole judgment, join the Writer, or such others as the Publisher may deem advisable, as parties in any suits or proceedings and bring any suits or proceedings in the name of the Writer or the Publisher, or in the name of any other parties as the Publisher may deem advisable.  The Publisher shall proceed with and dispose of such suits or proceedings in the same manner and to the same extent and to all intents and purposes as the Writer or any other party or parties might or could do had this authority not been given.  Any legal costs and disbursements shall initially be incurred by the Publisher.  Any sums recovered by the Writer or the Publisher by way of damages or otherwise shall after recovery of all legal costs and disbursements paid the Publisher be shared as to 75% to the Writer and 25% to the Publisher.

## 14.  CLAIMS

If at any time any claim, whether written or oral, is presented against the Publisher which is inconsistent with any of the Writer's covenants, undertakings, representations or warranties herein contained and if because of such claim the Publisher, in its sole discretion, deems itself placed in jeopardy, then the Publisher shall thereupon notify the Writer as to the full details of such claim as then known to the Publisher.  Thereafter and until such claim has been finally adjudicated or settled the Publisher, in its sole discretion, shall have the right to withhold an amount consistent with the potential liability under such claim from any and all monies becoming due and payable to the Writer hereunder.  Upon the final adjudication or settlement of such claim the Publisher shall disburse all funds held by it in accordance with the terms of any settlement, judgment or other disposition thereof.  If proceedings are not commenced within six (6) months after any such withholding is made the Publisher shall release the withholding to the Writer.

## 15   TERMINATION AND SUSPENSION

(a)     (i)     In the event the Publisher shall enter into liquidation (other than a voluntary liquidation for the purposes of reconstruction or re-organisation) or shall make any assignment for the benefit of or make any composition

with its creditors, or if a bankruptcy or any insolvency proceedings shall be filed by or against the Publisher and not discharged within ninety (90) days the Writer shall have the right to terminate the Term of this Agreement forthwith by written notice to the Publisher.

(ii)     If the Publisher shall materially default in the performance of any of the material obligations or duties of the Publisher and such default shall continue for a period of thirty (30) days after receipt by the Publisher of notice in writing from the Writer alleging such default, the Writer shall be entitled forthwith to terminate the Term of this Agreement by written notice to the Publisher.

(b)     (i)     In the event the Writer shall enter into bankruptcy or make any composition with its creditors or if trustee in bankruptcy is appointed to take over all or a substantial part of the Writer's assets and undertaking and is in control thereof for fifteen (15) days or more the Publisher shall have the right to terminate the Term of this Agreement forthwith by written notice to the Writer.

(ii)     If the Writer shall materially default in the performance of any of the material obligations or duties of the Writer and such default shall continue for a period of thirty (30) days after receipt by the Writer of notice in writing from the Publisher alleging such default the Publisher shall be entitled forthwith to terminate the Term of this Agreement by written notice to the Writer.

(c)     Any such termination of the Term shall be without prejudice to the rights of the Publisher hereunder in respect of each and all of the Compositions to which the Publisher was entitled at the date of such termination.

## 16. LIFE ASSURANCE

The Publisher shall have the right to insure its interest in the Writer's life by taking out at its own expense a life assurance policy on such the Writer's life and the Writer shall fully co-operate with the Publisher in the completion of the appropriate application and will attend any necessary medical examination (which will be with the Writer's own doctor if approved by the insurer) and take any other steps required by the Publisher in this connection.  The Writer shall have no liability to the Publisher if the Publisher is unable to obtain cover on terms satisfactory to the Publisher.

## 17. ASSIGNMENT

The Publisher may assign this Agreement and/or any or all of its rights hereunder to its parent undertaking, subsidiary undertaking, to any company or associated company owned by the Publisher's parent undertaking or to any company acquiring substantially all the undertakings or assets of the Publisher or its holding company or subsidiaries or affiliates thereof.  The Publisher shall remain primarily liable to fulfil the Publisher's obligations under this agreement notwithstanding any such assignment.  The Writer shall only be entitled to assign this Agreement with the prior written consent of the Publisher.  Subject to the provisions hereof each assignment shall be binding upon and inure for the benefit of and may be enforced by the successors and assigns of the Publisher and the

Writer respectively. For the purpose of this clause "parent undertaking" and "subsidiary undertaking" shall have the meanings set out in Section 1162 of the Companies Act 2006, and "associated company" shall mean a company which is associated with another company either through holdings of shares to an extent of not less than twenty-five percent (25%) of its equity share capital (as defined in the said Act) or through common directors to an extent of not less than one third for the time being of the total number of directors.

18.  NOTICES

(a)     Any notice, accounting or payment which either party hereto is required or desires to give to the other shall be sent by hand or pre-paid registered post addressed to the address(es) first set forth or to the most recent of such other address as such party shall have designated in writing to the other party.  A copy of each notice to the Publisher shall be sent to Andy Stinson, 5 Blenkarne Road, London, SW11 6HZ.

(b)     Wherever the consent or approval of the Writer is required under the terms of this Agreement such consent or approval shall not be unreasonably withheld and the Writer shall grant or withhold such consent or approval in writing within five (5) working days after the date that the Writer receives the request for such consent or approval from the Publisher via e-mail to Navarro@entlegal.us.  Failure by the Writer to notify the Publisher as aforesaid shall be deemed to be consent or approval.

19.  MISCELLANEOUS

(a)     A waiver by either party of any term or condition of this Agreement in a particular instance shall not be deemed or construed to be a waiver of such term or condition for the future.  All rights, remedies, undertakings and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other right, remedy, undertaking or obligation of either party.

(b)     This Agreement contains all of the terms agreed between the parties and replaces any and all previous agreements, whether written or oral, concerning the subject matter of this Agreement.  This Agreement shall not be modified or varied except by a written instrument signed by the parties hereto.

(c)     Nothing herein contained shall be construed or deemed to constitute a partnership or joint venture between the parties hereto and neither party shall be bound by any representation, act or omission of the other.

(d)     The Writer hereby irrevocably and unconditionally waives any and all moral rights that the Writer has in the Compositions as between the Writer and the Publisher or any party authorized to exploit the Compositions by the Publisher and hereby agrees not to make any claim against the Publisher or any party authorized to exploit the Compositions by the Publisher based on moral or similar rights in the Compositions Provided Always That the license granted by the Publisher or any party authorized to exploit the Compositions by the Publisher is in accordance with the terms of this Agreement.

## 20.    RIGHTS OF THIRD PARTIES

Save to the extent expressly set out herein, this Agreement is not intended to nor shall it create any rights, entitlements, claims or benefits enforceable by any person that is not a party to it.  Accordingly, save to the extent expressly set out in this Agreement no person shall derive any benefit or have any right, entitlement or claim in relation to this Agreement by virtue of the Contract (Rights of Third Parties) Act 1999.

## 21.  LEGAL JURISDICTION

This Agreement shall be construed in accordance with English Law and each party hereto agrees to submit to the exclusive jurisdiction of the English Courts.

## 22.  GOVERNMENT REGULATIONS

This Agreement and the provisions hereof and each of them are subject to the legal and governmental regulations and foreign exchange control regulations of each country of the Territory.

## 23.  HEADINGS

The headings to the Clauses of this Agreement are included for ease of reference only, are not part of this Agreement and are not to be taken into account in its construction.

## 24.   SEVERANCE

If any Clause or any part of this Agreement or the application thereof to any person shall for any reason be adjudged by any court or other legal authority of competent jurisdiction to be invalid, such judgment shall not affect the remainder of this Agreement which shall continue in full force and effect.


AS WITNESS the hands of the parties the day and year first above written.



SIGNED BY:


..................
**Adnan Khan**
(pka "Menace")

SIGNED BY:



..................
for and on behalf of
**STELLAR SONGS LIMITED**

<u>SCHEDULE A</u>

Compositions existing at the date of this Agreement

**Part** I

| Title | Writers | % written by Writer |
|-------|---------|---------------------|
| Panda | Adnan Khan/ Sidney Selby | 30% |

**Part II**

| Title | Writers | % written by Writer |
|-------|---------|---------------------|
| None | | |

<u>SCHEDULE B</u>

<u>CLEARANCE REQUEST FORM</u>

1.      **ORIGINAL WORK**

Title of original work used: ............................................

Writer(s) of original work: ............................................

Publisher(s) of original work: ..........................................

Territory.    ..............................................

Version of original work/artist: ........................................

Brief description of original work within new title: ....................

..........................................................................

2.      **NEW WORK**

Title of original work used: ............................................

Does this contain any other uses or samples of songs? (which):............

..........................................................................

Writer(s) of new work: ..................................................

Publisher of new work: ..................................................

Artist: .................................................................

3.      **PROPOSED RELEASE INFORMATION**

Label and catalogue number: ............................................

Format (album; single, etc): ...........................................

Proposed release date: ..................................................

Territory of release: ...................................................

4.      **ANY OTHER INFORMATION**

..........................................................................

5.      **REQUESTED BY**:

..........................................................................

# Signature Certificate



 Document Reference:   2AD22JIUC2FKILCTRCZP2H



**Adnan Khan**
Party ID: ZS79IAIYS2U7Z9XRPHWVL5
IP Address: 92.40.248.218

| VERIFIED EMAIL: | menacemakesbeats@gmail.com |



| Multi-Factor Digital Fingerprint Checksum | 401f510e0c9b4f3907c26bde71f44d7adef61827 |  |

| Timestamp | Audit |
|---|---|
| 2016-04-22 13:56:29 -0700 | All parties have signed document. Signed copies sent to: Adnan Khan and Navarro W. Gray, Esq.. |
| 2016-04-22 13:56:29 -0700 | Document signed by Adnan Khan (menacemakesbeats@gmail.com) with drawn signature. - 90.207.212.28 |
| 2016-04-22 12:44:34 -0700 | Document viewed by Adnan Khan (menacemakesbeats@gmail.com). - 92.40.248.218 |
| 2016-04-22 10:37:10 -0700 | Document created by Navarro W. Gray, Esq. (navarro@entlegal.us). - 96.242.250.53 |



This signature page provides a record of the online activity executing this contract.

**Page 1 of 1**

# Exhibit E





Page two of two
Re:    Adnan Khan p/k/a "Menace" w- Stellar Songs Limited

3.    Your compliance with this authorization will constitute an accommodation to us alone, and nothing herein shall constitute Timeless Music Entertainment, or Gray as beneficiaries of or parties to this instrument or any other agreement between you and I. All payments hereunder will constitute payment to us (and Writer per our instructions as set forth in the Agreement), and you will have no liability by reason of any erroneous payment you may make or failure to comply with this authorization. We and Writer will indemnify and hold you harmless against any claims asserted against you and any damages, losses or expenses incurred by you by reason of any such payments or otherwise in connection herewith (including legal expenses and reasonable outside attorneys' fees).

Very truly yours,
Adnan Khan p/k/a "Menace"
AK Menace Publishing

By: _____
        Adnan Khan

Acknowledged and Agreed:

Timeless Music Entertainment                 The Gray Law Firm LLC

By: _____                By: _____
        Daniel Desir                                         Navarro W. Gray, Esq.

2

---

## Signature Certificate        RightSignature
Easy Online Document Signing

Document Reference:   6T5LR6I423BM4HAV36YGW8

Navarro Gray
Party ID: JWK8V4J925DWWXALLJLV7R
IP Address: 96.242.252.230
VERIFIED EMAIL:  navarro@thegrayfirmnj.com

Multi-Factor
Digital Fingerprint Checksum    28495бc326baba053aa5b04514229b6dd9ebb765

Adnan Khan
Party ID: CYIYDLIRIMI9YCRRKZBJ2UK
IP Address: 94.197.121.175
VERIFIED EMAIL:  menacemakesbeats@gmail.com

Multi-Factor
Digital Fingerprint Checksum    b44c19a48397cfa1b1e3baf151a481ab9b42e75d

Daniel Desir
Party ID: 6JLEXWINJK9S8THXKW3ZJ
IP Address: 172.56.34.196
VERIFIED EMAIL:  timelessmusicentertainment@gmail.co

Multi-Factor
Digital Fingerprint Checksum    6946b4fb4684f97cbf82de536d22fb2196cbfcb6

Timestamp                Audit
2016-04-25 10:14:06 -0700     All parties have signed document. Signed copies sent to: Navarro Gray, Adnan Khan, Daniel Desir, and Navarro W. Gray, Esq.

12:23

✕   Adnan_Khan_Men...       •••

ADNAN KHAN p/k/a MENACE/AK MENACE PUBLISHING
c/o The Gray Law Firm, LLC
254 State Street
Hackensack, New Jersey 07601

April 25, 2016

Stellar Songs Limited
c/o OJK
19 Portland Place
London, UK W1B 1PX

Re:     Adnan Khan p/k/a "Menace" w- Stellar Songs Limited

Gentlepersons:

1.      Reference is hereby made to the publishing agreement between Adnan Khan p/k/a "Menace" ("Writer") d/b/a AK Menace Publishing and Stellar Songs Limited ("Publisher") dated as of April 2016 (the "Agreement").  Except as defined herein, all capitalized terms shall have the same meanings ascribed to them in the Agreement.

2.      Although paragraph 6 of the Agreement, irrevocably directs you to pay me (Adnan Khan p/k/a "Menace") royalties, I hereby request and irrevocably authorize you (Stellar Songs Limited) to pay my royalties, when available, only as follows:

Twenty percent (20%) of all royalties available to

Timeless Music Entertainment, LLC
89-19 171st Street, Apt. 2U
Jamaica, NY 11432

And

Five percent (5%) of all royalties available to

The Gray Law Firm LLC ("Gray")
254 State Street
Hackensack, 07601

---

Page two of two
Re:     Adnan Khan p/k/a "Menace" w- Stellar Songs Limited

3.      Your compliance with this authorization will constitute an accommodation to us alone, and nothing herein shall constitute Timeless Music Entertainment, or Gray as beneficiaries of or parties to this instrument or any other agreement between you and I.  All payments hereunder will constitute payment to us (and Writer per our instructions as set forth in the Agreement), and you will have no liability by reason of any erroneous payment you may make or failure to comply with this authorization.  We and Writer will indemnify and hold you harmless against any claims asserted against you and any damages, losses or expenses incurred by you by reason of any such payments or otherwise in connection herewith (including legal expenses and reasonable outside attorneys' fees).

Very truly yours,
Adnan Khan p/k/a "Menace"
AK Menace Publishing

By: _____
        Adnan Khan

Acknowledged and Agreed: ███████████

# Exhibit F



12:28

✕    Adnan_Khan_Men...

Page two of two
Re:    Adnan Khan p/k/a "Menace" w- Stellar Songs Limited

The balance of the First Writer Advance as set forth in paragraph 7(a)(i)  of Five Hundred Sixty Thousand US dollars ($560,000.00) on behalf of Writer to:

The Gray Law Firm LLC Attorney Trust Account ("Gray")
254 State Street
Hackensack, 07601

3.    Your compliance with this authorization will constitute an accommodation to us alone, and nothing herein shall constitute Timeless Music Entertainment, or Gray as beneficiaries of or parties to this instrument or any other agreement between you and I.  All payments hereunder will constitute payment to us (and Writer per our instructions as set forth in the Agreement), and you will have no liability by reason of any erroneous payment you may make or failure to comply with this authorization.  You and Writer will indemnify and hold you harmless against any claims asserted against you and any damages, losses or expenses incurred by you by reason of any such payments or otherwise in connection herewith (including legal expenses and reasonable outside attorneys' fees).

Very truly yours,
Adnan Khan p/k/a "Menace"
AK Menace Publishing

By: _____
        Adnan Khan

Acknowledged and Agreed:

Timeless Music Entertainment              The Gray Law Firm LLC

By: _____      By: _____
        Daniel Desir                                    Navarro W. Gray, Esq.

2



**Signature Certificate**
🔒 Document Reference:   3SZTRMJ6VIF7HAHTC252P2

**R**ight**Signature**
Easy Online Document Signing

| | Navarro W. Gray | Electronic Signature |
| --- | --- | --- |
| | Party ID: 2BWK83IFB3DD3GUJZDF7CD | |
| | IP Address: 96.242.252.230 | |
| | VERIFIED EMAIL:  navarro@thegrayfirmnj.com | |

Multi-Factor Digital Fingerprint Checksum   284956c324baba053aa5b84524229b6dd9ebb763

| | Adnan Khan | Electronic Signature |
| --- | --- | --- |
| | Party ID: KGIIZ9UIFY5539LFLLB3VNF | |
| | IP Address: 94.197.121.175 | |
| | VERIFIED EMAIL:  menacemakesbeats@gmail.com | |

Multi-Factor Digital Fingerprint Checksum   b44c19e48397cfa1b1e3baf251e681ab9b42e75d

Daniel Desir

12:28 

✕     Adnan_Khan_Men...            •••

ADNAN KHAN p/k/a MENACE/AK MENACE PUBLISHING
c/o The Gray Law Firm, LLC
254 State Street
Hackensack, New Jersey 07601

April 25, 2016

Stellar Songs Limited
c/o OJK
19 Portland Place
London, UK W1B 1PX

Re:    Adnan Khan p/k/a "Menace" w- Stellar Songs Limited

Gentlepersons:

1.    Reference is hereby made to the publishing agreement between Adnan Khan p/k/a "Menace" ("Writer") d/b/a AK Menace Publishing and Stellar Songs Limited ("Publisher") dated as of April 2016 (the "Agreement"). Except as defined herein, all capitalized terms shall have the same meanings ascribed to them in the Agreement.

2.    Although paragraph 7 of the Agreement, irrevocably directs you to pay me (Adnan Khan p/k/a "Menace") Seven Hundred Thousand US dollars ($700,000.00) within seven (7) days of the execution of this Agreement ("First Writer Advance") and Seven Hundred Thousand US dollars ($700,000.00) following the earlier of recoupment of the first advance, ("Second Writer Advance"), I hereby request and irrevocably authorize you (Stellar Songs Limited) to pay the Writer Advance, only as follows:

From the First Writer Advance of Seven Hundred Thousand US dollars ($700,000.00) set forth in paragraph 7(a)(i):

One Hundred Forty Thousand US dollars ($140,000.00) of the Writer Advance on behalf of Writer to:
Timeless Music Entertainment, LLC
89-19 171st Street, Apt. 2U
Jamaica, NY 11432

And

From the Second Writer Advance of Seven Hundred Thousand US dollars ($700,000.00) set forth in paragraph 7(a)(iii):

One Hundred Forty Thousand US dollars ($140,000.00) of the Writer Advance on behalf of Writer to:
Timeless Music Entertainment, LLC
89-19 171st Street, Apt. 2U
Jamaica, NY 11432

---

Page two of two
Re:    Adnan Khan p/k/a "Menace" w- Stellar Songs Limited

The balance of the First Writer Advance as set forth in paragraph 7(a)(i) of Five Hundred Sixty Thousand US dollars ($560,000.00) on behalf of Writer to:

The Gray Law Firm LLC Attorney Trust Account ("Gray")
254 State Street
Hackensack, 07601

3.    Your compliance with this authorization will constitute an accommodation to us alone, and nothing herein shall constitute Timeless Music Entertainment, or Gray as beneficiaries of or parties to this instrument or any other agreement between you and I. All payments hereunder will constitute payment to us (and Writer per our instructions as set forth in the Agreement), and you will have no liability by reason of any erroneous payment you may make or failure to comply with this authorization. We and Writer will indemnify and hold you harmless against any claims asserted against you and any damages, losses or expenses incurred by you by reason of any such payments or otherwise in connection herewith (including legal expenses and reasonable outside attorneys' fees).

Very truly yours,
Adnan Khan p/k/a "Menace"
AK Menace Publishing

By:

Exhibit G

# PRODUCER AGREEMENT

**AGREEMENT** made and entered into as of this ___ day of April  2016, by and between **SIDNEY SELBY p/k/a "DESIIGNER"** with an address c/o the Law Offices of Robert A. Celestin, Esq., 1650 Broadway, Suite 505A, New York, NY 10019 (hereinafter referred to as "Artist") and **ADNAN KHAN p/k/a "MENACE"** c/o The Gray Law Firm, LLC, 254 State Street, Hackensack, New Jersey 07601 (hereinafter sometimes referred to as "you", "your" or "Producer").  This Agreement shall supersede all prior agreements, including the Producer's Declaration and the Addendum thereto, executed by the parties on November 13, 2015 and February 4, 2016, respectively.

The parties hereby agree as follows:

## 1.    EMPLOYMENT AND TERM

**(a)**    Artist hereby engages your non-exclusive personal services to produce one (1) master recording(s) embodying the performance of Artist, for possible inclusion on Artist's forthcoming album (the "Artist Album") pursuant to Artist's exclusive recording agreement (the "Recording Agreement") with Getting Out Our Dreams/Def Jam Recordings, a division of UMG Recordings, Inc. ("UMG"), dated February 1, 2016 ("Record Company").  Relevant provisions of the Recording Agreement are annexed hereto as Exhibit "A" and incorporated herein by this reference.  You accept such engagement and agree to render such production services for Artist during the term hereof upon the terms and conditions hereinafter set forth.  The master recordings, listed on Schedule "A" attached hereto and incorporated herein by this reference, which are produced hereunder are hereinafter referred to as a "Master(s)".

**(b)**    The term of this Agreement shall commence upon the date hereof.  You shall deliver the Master(s) to be produced hereunder no later than thirty (30) days after the date set forth above (the "Term").  Your services shall be deemed complete upon delivery subject to paragraph 3 herein. Notwithstanding the foregoing, as of the date hereof, subject to Record Company's and Artist's rights in the event of your breach of any representations and/or warranties made by you hereunder and/or your failure to comply with your respective obligations hereunder, Artist acknowledges timely and satisfactory completion of the Producer Services required to be rendered by you in connection with the Master(s) hereunder and technically and commercially satisfactory delivery of the Master(s).

## 2.    SERVICES

**(a)**    During the Term, Producer shall perform the following "Producer Services":  (i) produce one (1) master recording(s) embodying Artist's performances; and (ii) perform such other services in connection with the Master(s) as are set forth herein

and/or customarily performed by producers in the recording industry until such time as the Producer Services have been fully performed.  You shall at all times diligently, competently, and to the best of your ability perform the services to be performed hereunder;

**(b)**     The times and places of all recording sessions produced hereunder, the selections to be recorded at such recording sessions, the accompanying artists (vocal and instrumental) to perform at such recording sessions and the other creative and technical personnel to be utilized shall be mutually designated by you, Artist and/or Record Company;

**(c)**     With respect to the Master(s) produced hereunder, and unless Artist and/or Record Company otherwise agrees in writing:

**(i)**     The Master(s) shall embody the studio performances by Artist of selections approved by Artist and not previously recorded by Artist, shall be recorded in a first-class recording studio, and shall not embody any so-called "live" performances of Artist.

**(ii)**     The Master(s) shall be subject to the approval of Artist and/or Record Company as technically and commercially satisfactory for the manufacture and sale of phonograph records.

**(d)**     You shall deliver the Master to be produced hereunder no later than thirty (30) days after the date set forth above.

## 3.     <u>RECORDING PROCEDURE</u>

With respect to the Master(s) produced hereunder, you shall:

**(a)**     Produce, record, mix, edit and master the Master(s);

**(b)**     Perform such other services in connection with the Master(s) as are customarily performed by producers in the recording industry, including, without limitation, engaging vocalists, conductors, contractors, arrangers and copyists, and arranging for the use of recording studios and other necessary technical facilities and personnel;

**(c)**     Deliver to Artist and/or Record Company fully edited and leadered stereophonic master recordings technically and commercially satisfactory to Artist and Record Company, in Artist and Record Company's sole discretion, for the manufacture and sale of phonograph records.  Upon Artist's or Record Company's request, you shall re-record, re-mix, re-edit and/or re-master the master recordings until Master(s) satisfactory to Artist and/or Record Company have been obtained.  Upon Artist's request, you shall deliver to Artist or Record Company versions of the Master(s), which are edited for use on singles.  All original sessions tapes/recordings (including without limitation, all

multi-track tapes and computer hard drives or other digital storage devices and related files) and any derivatives, duplicates or reproductions thereof shall also be delivered to Artist or Record Company, or to any other location designated by Artist or Record Company. One (1) safety copy of each original multi-track tape/recording and for all digital non-tape based formats, a complete data back-up of each recording in a data-tape format acceptable to Record Company;

      **(d)**     Maintain and submit job sheets and deliver to Artist and/or Record Company within forty-eight (48) hours after each recording session hereunder, properly completed session reports, and all other documents, information and other materials, if any, (including but not limited to Forms B and W-4 and similar withholding forms) required by Artist in order to make payment when due of union scale compensation, or in order to effect timely compliance with any other obligations under any applicable agreement with any union or labor organization in connection with the Master(s).  You shall pay or reimburse Artist or Record Company, upon demand, for any penalties, fines, late charges or other costs incurred solely by reason of your failure to properly and timely comply with the foregoing; and any such sums paid by Artist or Record Company without limiting Artist's or Record Company's rights, be applied by Artist in reduction of any royalties or other sums, if any, payable to you under this Agreement;

      **(e)**     Deliver to Artist and/or Record Company all necessary licenses, approvals, consents and permissions to exploit and otherwise use the Master(s) as contemplated herein.  Your submission of the Master(s) to Artist or Record Company shall constitute your representation that you have obtained all such material;

      **(f)**     You shall not enter into any agreements on behalf of Artist or Record Company or incur, directly or indirectly, any liability or expense of any kind for which Artist and/or Record Company may be held liable, in connection with any recording session hereunder or otherwise, without having first obtained Artist and Record Company's prior written approval as to the nature, extent and limit thereof, except with respect to the payment of items identified in the approved budget, provided that the amount of such payment does not exceed the amount budgeted for such item.  Notwithstanding the foregoing, Artist hereby acknowledges that the Master(s) has been delivered within budget;

      **(g)**     Producer shall not allow any person to enter a recording session unless such person is approved by Artist or Record Company, and Producer shall not allow others to record a copy of any materials recorded or otherwise created hereunder. Artist and Record Company, and/or any designated representative thereof, shall have the right and opportunity to attend each recording session conducted in connection with the production of the Master(s) at Artist's or Record Company's sole, non-recoupable expense;

      **(h)**     Artist shall have the right to engage other producers, remixers and/or mixers to render additional production, remixing and/or mixing services in respect of the Master(s); and

      **(i)**     If applicable, comply with the Immigration Reform and

Control Act of 1986 ("IRCA") and all other statutes, rules and regulations of the United States and any applicable state jurisdiction regarding the performance of services by non-citizens of the United States including, without limitation, the following procedures:

      **(A)**      Before any person, solely with respect to those engaged by you, renders services in connection with the recording of the Masters hereunder (including, without limitation, each background and/or foreground instrumentalist, background and/or foreground vocalist, producer, engineer, mixer and remixer):

      **(1)**      You will require and in fact cause each such person to complete and sign the EMPLOYMENT ELIGIBILITY VERIFICATION form ("Form I-9"), unless you shall already have obtained (and retained) a completed Form I-9 from that person within the three (3) year period immediately preceding the date of the applicable recording session;

      **(2)**      You will complete and sign the EMPLOYER REVIEW AND VERIFICATION ("Employer Section") of each such Form I-9; and

      **(3)**      You will attach full and complete copies of the documents examined establishing identity and employment eligibility in accordance with the instructions in the Employer Section of Form I-9.

      **(B)**      You shall not permit any person, solely with respect to those engaged by you, who fails to complete the Employee Section of a Form I-9 (or who fails to furnish you with required documentation of identity and employment eligibility) to render any services in connection with the recording of the Master(s) pursuant to this Agreement.

      **(C)**      You shall deliver all duly completed Form I-9s (with copies of the identity and eligibility documents attached) to Artist within ninety-six (96) hours after the conclusion of the applicable recording session.

      **(D)**      You shall comply with any revised or additional verification and documentation procedures required by the United States Department of Immigration and Naturalization (the "INS") (or any other person with jurisdiction over non-citizens who perform services in the United States) in the future.

      **(E)**      Notwithstanding the generality of the above, in the event the INS agrees to recognize methods of compliance with IRCA which may be performed in lieu of the procedures enumerated above, such as, for example, the registration and identification card system administered by the Recording Industry Association of America (the "RIAA"), you may comply with such alternative methods in performing the obligations set forth above.

## 4.   RECORDING COSTS; RECOUPMENT

(a)     You shall prepare and submit for Artist and Record Company's sole approval a recording budget pursuant to which you, on behalf of Artist, shall engage the services of all personnel required in connection with the recording of the Master(s) to be produced hereunder.  You shall not incur any costs until Artist and Record Company have approved the budget. All recording costs shall be paid by Record Company (subject, however, to the provisions of paragraph 4(b) as applicable, in the event that such recording costs exceed the approved budget);

(b)     You shall deliver to Artist and/or Record Company copies of substantiating invoices, receipts, vouchers and similar satisfactory documentary evidence of recording costs, and if you fail to do so, Artist's or Record Company's obligations to pay such costs will be suspended until delivery thereof.  If and to the extent that the recording costs in connection with the Master(s) produced hereunder exceed the recording budget for reasons due solely to your acts or omissions, then you shall be solely responsible for payment of such excess costs.  For the avoidance of doubt, you will not be responsible for any third party mixing or mastering costs in connection with the Master(s). Nothing contained in this Agreement shall obligate Artist or Record Company to permit the continuation of any recording session or project if Artist or Record Company reasonably anticipates that the recording costs will exceed those specified in the approved budget or that the Master(s) being recorded will not be technically and commercially satisfactory.  In the event Artist or Record Company, in Artist's or Record Company's sole discretion, pays any such excess costs, you shall promptly reimburse Artist or Record Company therefor upon demand.  Moreover, Artist or Record Company shall have no obligation to pay (i) any recording costs with respect to the Master(s) which are not recorded in accordance with all of the material terms and conditions of this Agreement, (ii) any recording fees or arranging fees which exceed union scale (unless such excess, and the proposed recipient thereof, are specified in the proposed budget and approved by Artist and Record Company), and (iii) any penalties, fines, late charges or other costs incurred for late payment of recording costs if such late payment is not the fault of Artist or Record Company.  In the event Artist or Record Company pays any costs or fees described in the preceding sentence, you shall be deemed responsible for such costs or fees so paid by Artist or Record Company, and you shall promptly reimburse Artist or Record Company therefor upon demand.  Any sums paid by Artist or Record Company and not promptly reimbursed by you as provided in this paragraph may, at Artist's or Record Company's sole election and without limiting Artist and Record Company's rights, be applied by Artist or Record Company in reduction of any royalties or other sums payable to you under this Agreement; and

(c)     Notwithstanding anything to the contrary contained in this Agreement, it is specifically understood and agreed that no royalties shall be payable to you hereunder unless and until Artist has recouped all recording costs incurred in connection with the Artist Album from the "net artist" royalties (i.e., the "all-in" royalty payable by Record Company to Artist excluding the royalties payable to all third-party producers, including Producer) payable to Artist by Record Company in respect of the

Master(s) recorded.  After recoupment of such recording costs in accordance with the preceding sentence, royalties shall be payable to you hereunder for all records sold for which royalties are payable, retroactively from the first such record sold, subject to recoupment from such record royalties of any advances paid to you hereunder.

## 5.   **ROYALTIES**

In consideration of the rights granted to Artist and conditioned upon your full performance of all of the material terms and conditions of this Agreement, you shall be entitled to be paid royalties as follows:

**(a)**    With respect to net sales through normal retail channels in the United States of Albums ("USNRC") containing the Master(s) recorded hereunder, a royalty of three (3%) percent of the suggested retail list price or its P.P.D.  (principal price to dealers) or wholesale price equivalent.  In the event USNRC net sales shall exceed five hundred thousand (500,000) units, the royalty shall increase prospectively by one-half (1/2%) percent to three and one-half (3 1/2%) percent of the retail price.  In the event USNRC net sales shall exceed one million (1,000,000) units, the royalty shall increase prospectively by one-half (1/2%) percent to four (4%) percent of the retail price;

**(b)**    The royalty payable to you for singles, budget records, club sales, foreign sales and other sales or uses of the Master(s) produced hereunder shall be reduced in the same proportion that the basic royalty rate payable by Record Company to Artist for net sales of the Artist Album through normal retail channels in the particular territory in respect of the Master(s) is reduced pursuant to Artist's agreement with Record Company, provided that with respect to sales or uses of the Master(s) for which Artist receives a royalty pursuant to the Recording Agreement, which is computed as a percentage of Record Company's net receipts, net monies, or the like, your royalty rate shall therefor be multiplied by a fraction (the "<u>Fraction</u>"), the numerator of which is equal to your basic royalty rate as set forth in paragraph 5(a) above, and the denominator of which is equal to Artist's basic "all-in" royalty rate (i.e., Artist's royalty, plus the royalty payable to all producers, including Producer) for net sales of the Artist Albums sold through normal retail channels in the United States as set forth in the Recording Agreement;

**(i)**    Notwithstanding the foregoing, no royalty shall be credited or payable to you hereunder with respect to any records comprised solely of an excerpt of a recording of ninety (90) seconds or less in duration.

**(c)    (i)**    All royalties payable to you hereunder shall be computed, determined, calculated and paid in the same manner (e.g., definition of net sales, container charges, free goods, suggested retail list price, reserves, so called "bundled package", etc.) as royalties payable to Artist by Record Company are computed, determined, calculated and paid pursuant to the Recording Agreement;

**(ii)**    If Artist receives any monies or is credited with any

monies against advances previously received from persons or entities other than Record Company ("Defined Third Parties") which are attributable to the exploitation of the Master(s), including by way of example, monies paid by SoundExchange, AARC or any other Defined Third Party making payments in connection with either digital performing rights in masters or blank recording media levies (but specifically excluding monies paid to or credited to Artist from the exploitation of the musical compositions embodied in the Master(s)), Artist shall pay you, or cause to be paid to you, your pro-rata share of such monies determined by multiplying such monies, received by or credit to us, by the Fraction (i.e., [3/17]. Artist shall irrevocably instruct and use reasonable efforts to cause SoundExchange (or any other applicable third party) to pay directly to you monies due you hereunder pursuant to an irrevocable SoundExchange letter of direction substantially in the form of Exhibit "C" annexed hereto; and

    **(iii)**  With respect to audiovisual recordings ("Videos") embodying the Master(s) produced hereunder, your royalty shall be an amount equal to fifty (50%) percent of the amount determined by multiplying Artist's royalty rate for such Video pursuant to the Recording Agreement by a fraction, the numerator of which is equal to your basic royalty rate pursuant to paragraph 5(a) above and the denominator of which is equal to Artist's basic "all-in" royalty rate for net sales of the Album in the United States as set forth in the Recording Agreement, and your royalty shall be pro-rated as provided in paragraph 5(d) below. Notwithstanding anything to the contrary contained herein, you shall not be credited with any royalty in respect of a Video unless and until Artist/Record Company has recouped all costs incurred in the production of such Video from its net receipts in respect of such Video (as net receipts are determined pursuant to the Recording Agreement) and following such recoupment, your royalty for Video shall be credited to your account on a prospective basis only.

    **(d)**  As to records not consisting entirely of the Master(s) produced hereunder, the royalty rate otherwise payable to you hereunder with respect to sales of any such record shall be pro-rated multiplying such royalty rate by a fraction, the numerator of which is the number of Master(s) produced hereunder embodied on such record and the denominator of which is the total number of royalty bearing masters (including the Master(s)) embodied thereon;

    **(e)**  **(i)**  In the event any of the Master(s) are produced by you with another producer to whom Artist or Record Company shall be obligated to pay a royalty, or in the event any other producer to whom Artist or Record Company shall be obligated to pay a royalty shall perform additional services with respect to the Master(s) produced by you hereunder, the royalty payable to you hereunder with respect to the Master(s) shall be reduced by the royalty payable by Artist or Record Company to such other produce.

    **(ii)**  Notwithstanding the foregoing, if any third party, other than Producer, provides additional production to the Master(s) after satisfactory delivery and acceptance of the Master(s) by Artist or Record Company, your royalty rate will not be reduced as provided herein, except that, however, in no event will a reduction

in the producer royalty rate in connection with the engagement of such third party exceed one (1%) percent.

        **(f)**    As an accommodation to you, Producer hereby authorizes and directs five (5%) percent (i.e., 0.15%) of the royalty due to Producer to be payable to his attorney, Navarro W. Gray, Esq., at 254 State Street, Hackensack, NJ 07601 ("Attorney").  Nothing contained herein shall constitute Attorney as a beneficiary of or party to this agreement or any other agreement between you, Artist and/or Record Company.  All payments to Attorney (including payments referenced in paragraph 7 below) will constitute payment to Producer and neither Artist nor Record Company will be liable by reason of any erroneous payments made in connection with this authorization nor shall Artist's and/or Record Company's failure to comply with this authorization.

## 6.    <u>ACCOUNTINGS</u>

        **(a)**    Accountings as to royalties payable hereunder shall be made by Artist to you within ninety (90) days following each June 30th and December 31st for the preceding six (6) month period, together with the payment of accrued royalties, if any, earned by you during such preceding half-year after deduction of Advances and other permissible deductions.  All royalty statements and all other accounts rendered by Artist to you shall be binding upon you and not subject to any objection by you for any reason unless specific objection in writing, stating the basis thereof, is given to Artist within two (2) years from the date rendered.  You shall be foreclosed from maintaining any action, claim or proceeding against Artist in any forum or tribunal with respect to any statement or accounting due hereunder unless such action, claim or proceeding is commenced against Artist in a court of competent jurisdiction within two (2) years after the date such statement or accounting is rendered.  You shall have the right to appoint a Certified Public Accountant or attorney, who is not then currently engaged in an outstanding audit of Artist, to examine Artist's sale books and records relating to the sale of records hereunder (but excluding any books or records relating to the manufacture of records) provided that such examination shall take place at Artist's offices during normal business hours, on reasonable written notice, not more frequently than once in any calendar year and at your sole cost and expense.  Such examination may be conducted only once with respect to a particular statement and only within twelve (12) months after the date such statement is rendered.  You shall cause your accountant to deliver a copy of his audit report to Artist within three (3) months after the completion of said accountant's examination of Artist's books and records.  Notwithstanding the foregoing, Artist shall instruct and use reasonable efforts to cause Record Company to account to and pay to you directly any royalties due you hereunder pursuant to a Letter of Direction in substantially the form of Exhibit "B" annexed hereto and incorporated herein by this reference, at the same times as Record Company is required to account to Artist pursuant to the Recording Agreement;

        **(b)**    The rights granted to you constitute your sole right to examine Artist's books and records.  For the avoidance of doubt, you shall not have the right to

examine Record Company's books and records.  In the event Artist conducts an examination of Record Company's books and records which pertain to the Master(s) produced hereunder and as a result of such examination additional monies are owed to Artist, Artist shall notify you in writing thereof and you shall be entitled to receive your proportionate share, if applicable, of any recovery there from less your proportionate share of costs incurred in connection therewith.  Notwithstanding the foregoing, Artist's inadvertent failure to notify you in writing shall not constitute a breach of this Agreement; and

(c)      No royalties shall be payable to you on sales of phonograph records by any of Record Company's or Artist's licensees until payment on those sales has been received by Record Company (if Record Company is accounting to you directly) or by Artist in the United States.  Sales by licensees shall be deemed to have occurred in the semi-annual accounting period during which that licensee shall have rendered to Record Company (if applicable) or Artist accounting statements and payments for those sales.

7.     **ADVANCES**

(a)      Conditioned upon your performance of all of the material terms and conditions hereof and in consideration for all services rendered by you in connection with the Master(s), Artist shall cause Record Company to pay you a producer advance in the amount of One Hundred ($100.00) Dollars (the "Advance").  Producer hereby acknowledges full receipt of the Advance.

(i)      You shall have the opportunity to submit master recordings for possible inclusion on the first Artist Album.  In the event you submit an additional master recording(s) (the "Additional Master(s)") that is commercially and technically satisfactory to Artist and/or Record Company for inclusion on the first Artist Album, Artist shall pay you or cause Record Company to pay you an additional advance of Three Thousand ($3,000) Dollars per master (the "Additional Advance(s)"), of which One Thousand Five Hundred ($1,500.00) Dollars shall be paid directly to The Gray Law Firm, LLC, 254 State Street, Hackensack, NJ 07601.  Said Additional Advance(s) shall be payable one-half (1/2) promptly upon commencement of recording of each Additional Master(s) and the balance promptly following:  (1) satisfactory delivery to and acceptance by Artist and/or Record Company of the Additional Master(s) and (2) full execution of a separate fully negotiated producer agreement, the terms of which shall be substantially the same as those herein.

(b)      All amounts paid to you pursuant to paragraph 7(a) hereof, as well as all monies paid by Record Company to you, or on your behalf, during the term of this Agreement (other than royalties paid pursuant to paragraphs 5 and 9 hereof), shall constitute an Advance hereunder and shall be recoupable from any royalties payable to you hereunder (excluding mechanical royalties, except as otherwise provided herein).

8.    <u>**RESTRICTIONS**</u>

(a)    You shall not enter into any agreement or make any commitment which would interfere with your performance of any of the terms and provisions hereof; and

(b)    Producer shall not produce any selection or portion thereof produced hereunder for the purpose of making records for any person other than Artist for a period of three (3) years after the date of delivery by you of the Master(s) embodying such selection.  In the event you violate the foregoing restriction, Artist may, in addition to any other right or remedy which it may have on account of such breach, terminate its obligation to pay you any further royalties hereunder with respect to the exploitation of records containing the Master(s) as to which the restriction was violated.

9.    <u>**MECHANICAL LICENSES**</u>

(a)    The mechanical licenses for compositions recorded hereunder which are written and/or owned or controlled, in whole or in part, by you or any entity owned or controlled by, or affiliated with, you ("Controlled Composition(s)") are hereby irrevocably licensed to Artist and Artist's designees (including, without limitation, Record Company) for the United States at a rate equal to three-fourths (3/4) of the minimum statutory rate (without regard to playing time) pursuant to the United States Copyright Act, determined as of the date of the commercial release of the Master. Mechanical royalties shall only be payable on records for which royalties are payable hereunder;

(b)    In all other respects, including, without limitation, reduced mechanical royalty rates, determination of records on which mechanical royalties are payable, and terms applicable to audio-visual recordings, each Controlled Composition shall be licensed to Artist and Artist's designees upon the same terms and conditions as are applicable to Artist with respect to the Controlled Compositions pursuant to the Recording Agreement; and

(c)    With respect to Producer's contributions hereunder, if any compositions are recorded which are not Controlled Compositions, you warrant and represent that Artist or Record Company shall be able to obtain mechanical licenses therefor for the United States at rates and on terms no less favorable to Artist or Record Company than those contained in the then-current standard license form then being utilized by The Harry Fox Agency, Inc.

10.    <u>**ARTIST'S RIGHTS**</u>

(a)    The Master(s) produced hereunder shall, from the inception

of its creation, be considered a "work made for hire" for Artist within the meaning of the U.S. Copyright Law.  If it is determined that a Master does not so qualify, then such Master, together with all rights in it (including the sound recording copyright, but excluding the copyright to the underlying composition), shall be deemed transferred to Artist by this Agreement.  The Master(s) shall, from the inception of their creation, be entirely the property of Artist in perpetuity, throughout the world, free of any claim whatsoever by you, or by any persons deriving any rights or interests therefrom.  If and to the extent that the Master(s) or other aforementioned materials created hereunder are not deemed to be "works made for hire," then you hereby irrevocably assign to Artist or Record Company all of your right, title and interest in and to the Master(s) and/or other materials.  In furtherance of the foregoing, and upon Artist's or Record Company's request, you will execute and deliver to Artist or Record Company or their designees any and all assignments of copyright or other written documents as Artist may deem necessary to evidence the foregoing.  If you fail to do so within a reasonable period of time, then you hereby irrevocably appoint Artist or Record Company as your attorneys-in-fact for the purpose of executing such assignments or other documents in your and/or Producer's names.  Without limiting the foregoing, Artist and Record Company or their designees shall have the sole, exclusive and perpetual right to register the copyrights in and to the Master(s) and such other materials, in Artist's or Record Company's or their designees' names, as the owner and author thereof, and to secure any and all renewals and extensions of such copyrights (it being understood that for such purposes you, Producer and all other persons rendering services in connection with the Master(s) and other materials shall be Artist's employees for hire).  Furthermore, Artist and/or Record Company and their designees shall have the sole and exclusive right in perpetuity and throughout the world:

        **(i)**    To manufacture, advertise, sell, license, or otherwise dispose of the Master(s) and phonograph records derived therefrom upon such terms, and under such trademarks, as Artist elects, or, in its sole discretion, to refrain therefrom;

        **(ii)**    To perform the Master(s) publicly and to permit the public performance thereof by any method now or hereafter known; and

        **(iii)**    To use and publish your approved name (including all professional, group and assumed or fictitious names), approved likeness and approved biographical material in connection with the promotion, exploitation and sale of derivatives of the Master(s).

        **(b)**    Notwithstanding anything to the contrary contained in this Agreement, you acknowledge and agree that Artist shall, throughout the universe, in perpetuity, be the sole and exclusive owner (as "works made for hire") of any and all so-called "behind-the-scenes" and "making of" photographs and audio recordings and audiovisual recordings which display, duplicate and reproduce all or any part of the activities of Artist and other persons in connection with Artist's professional and personal life and activities (the "Reproductions") and that the Reproductions may contain scenes in which Producer and/or Producer's personnel appear recognizably and/or in which Producer's names, voices, likenesses, appearances and/or performances are used (the

"Scenes").  You hereby grant to Artist and it's designees, agents, licensees, and the like, throughout the universe, in perpetuity, the right to photograph, film, tape, record (audio and/or video) Producer's names, voices, likenesses, appearances and/or performances and activities in connection with the Scenes, and to exhibit, distribute, advertise, promote, or otherwise exploit, for commercial or non-commercial purposes, the Scenes without any limitations or restrictions of any kind and without any fees, payments or obligations to you and/or your personnel.

## 11.    REPRESENTATIONS AND WARRANTIES

You represent, warrant, covenant and agree as follows:

**(a)**    You are free to enter into and perform this Agreement with Artist, and are not and will not be under any disability, restriction or prohibition, contractual or otherwise, with respect to (i) your right to execute this Agreement, (ii) your right to grant all of the rights granted to Artist hereunder, and (iii) your right to fully perform each and every term and provision hereof.  You agree not to do or attempt to do, or suffer to be done, during or after the term hereof, any act in derogation of or inconsistent with Artist's rights hereunder;

**(b)**    Each Master produced hereunder nor any of the contents thereof, nor the manufacture or sale of records made from the such Master, nor any other exploitation or use thereof, and no materials, ideas or other properties furnished by you and embodied or contained in or used in connection with such Master or the packaging or advertising for phonograph records hereunder, shall violate any law or infringe upon any common law or statutory rights of any party, including without limitation, contractual rights, copyrights and rights of privacy.  Without limiting the generality of the foregoing, you specifically represent and warrant that no selections recorded or to be recorded hereunder are subject to any re-recording restriction under any previous recording contract to which you may have been a party.  Neither you nor any person rendering services hereunder is or will be a party to any contract which would in any way impair the rights granted Artist hereunder;

**(c)**    Each Master delivered hereunder shall be free of all liens and encumbrances, and there shall be no claims, demands or actions of any nature pending, threatened in writing or known to you with respect thereto which are not released prior to the delivery of the Master(s) involved;

**(d)**    Each Master produced pursuant to this Agreement shall be produced under and in conformity with any union agreements to which such Master may at any time be or become subject;

**(e)**    All of your representations and warranties shall be true and correct upon execution hereof and upon delivery of the Master(s) hereunder, and shall remain in effect for so long as Artist, its licensees, assignees, transferees or successors in

interests have any rights in or to the Master(s).  Artist's acceptance of the Master(s) or other materials hereunder shall not constitute a waiver of any of your representations, warranties or agreements in respect thereof;

        **(f)**     Artist shall not be required to make any payments of any nature for or in connection with the acquisition, exercise or exploitation of any rights granted to Artist hereunder, except as specifically provided in this Agreement.  You will pay all royalties or other compensation (whether in lieu of royalties or otherwise) becoming due to Producer or to any persons who perform or in any way contributed to the recording and/or production of the Master(s) delivered hereunder arising out of your acts and/or omissions (other than Artist, other producers engaged by Artist, or other persons engaged by Artist);

        **(g)**     Without limiting the generality of the foregoing, in rendering services hereunder, you will not "sample" or otherwise incorporate into the Master(s) (for convenience "Sample" or "Sampling" herein) or permit any other party, excluding Artist and Record Company, to Sample any copyrighted or otherwise proprietary material ("Proprietary Material") belonging to any other person, other than the Artist (such party herein referred to as "Owner") without first having (1) notified the Artist and Record Company of the Proprietary Material that you or your agent intend to use and the identity of the Owner(s) thereof and (2) secured from Owner(s) at your expense, a written Agreement, in a form satisfactory to the Artist and/or Record Company, that Artist and Record Company and their designees shall have the perpetual right to use such Proprietary Material in the Master(s) and to use or otherwise distribute or exploit the Master(s) containing such Proprietary Material for all record purposes, including without limitation, on MP3s, CDs and so-called "promotional" audio-visual devices (e.g., DVDs, internet streams, etc.) (and which audio-visual devices may visually display all or some of the lyrics of the Controlled Composition) and in any and all configurations now or hereafter known, and for use in music videos, in perpetuity, all either without any payment whatsoever to Owner(s) or upon payment to Owner(s) of a payment approved by Artist and/or Record Company (the "Clearance Efforts").  For the avoidance of doubt, you expressly acknowledge and agree that it is your sole responsibility to obtain all licenses which may be required in connection with the use of any Proprietary Materials in the Master(s).  You acknowledge that we have advised you that licenses for Proprietary Materials, whether musical or spoken, derived from such sources as motion pictures, television programs, political speeches, commercials, or newscasts are extremely difficult, time-consuming and expensive to obtain.  Artist or Record Company shall have no obligation to approve or to make any such payment, and Artist and Record Company's approval of any such payment shall not constitute a waiver of any of the Artist's or Record Company's rights or remedies. Nothing contained herein shall be deemed to be a waiver by Record Company or Artist of any of your delivery obligations hereunder and you hereby acknowledge that if any writers and/or publishers are to receive a copyright interest in or to any composition contained in or otherwise comprising Proprietary Materials, your and/or Producer's copyright interest (and/or monies attributable to such copyright interest) shall be reduced based on the amount required to be given to such writers and/or publishers.  In the event that the Master(s) contain Proprietary Material other than disclosed, and if you have not obtained and delivered to the Artist and Record Com-

pany all licenses, permissions or other authorizations required hereunder, then the Master(s) will be deemed to be not satisfactory for the manufacture and sale of phonograph records, regardless of the date that Artist or Record Company become aware of the existence of such Proprietary Material, and Artist and Record Company reserve the right to reject delivery of the Master(s). You warrant and represent that the Master(s) shall not contain any Proprietary Material which has not been licensed so as to allow Artist and Record Company and its designees to distribute the Master(s) as fully contemplated in this Agreement;

(i)     Notwithstanding anything to the contrary contained herein, Artist and/or Record Company, at their own election, may undertake control of all the Clearance Efforts hereunder. You acknowledge and agree that any of the payments made by Artist and/or Record Company in connection with the Clearance Efforts shall, without limitation of Artist's or Record Company's other rights and remedies, at Artist's or Record Company's election, shall be treated as excess costs recoupable from any monies payable to you hereunder.

(ii)     If Owner(s) seek a share of the so-called "sound recording rights" and/or "publishing rights" for use of Proprietary Material furnished by you in connection with the Master(s):

(A)     In connection with the Clearance Efforts of so-called "sound recording rights" for the use of such Proprietary Material, any and all clearance costs in excess of the Approved Budget, including without limitation, (1) contingency participation (whether expressed in royalty or penny-rate terms, and including an advance against such contingency participation) conveyed, or (2) flat-fee "buy-out" paid, to any Owner(s) shall, as between you and Artist, be borne by you.

(B)     In connection with so-called "publishing rights" for use of such Proprietary Material, any conveyance or assignment to Owner(s) of any contingency and/or administration and any and all clearance costs shall, as between you and Artist, be borne by you.

(h)     You acknowledge that you understand the importance of protecting Artist's and Record Company's intellectual property (including the Master(s)), and you hereby agree to take all necessary and appropriate security measures toward that end, including: (i) not playing or otherwise disclosing at any time the contents of any Master(s) or any portion thereof to any parties not involved in the actual recording, editing or mixing thereof prior to the initial commercial release of the Master(s); (ii) restricting access to any audio files embodying any Master(s), in whole or in part, solely to essential studio personnel; and (iii) ensuring the no copies of any Master(s), in whole or in part, shall be made or distributed in any manner without Record Company's express prior written authorization. You hereby acknowledge and agree that any dissemination or threatened dissemination of such Master(s) or any portion thereof prior to the authorized release of a phonograph record containing such Master(s) or any portion thereof shall necessarily result in irreparable harm and injury to Artist and/or Record Company for which no adequate

remedy is available at law and which is not fully compensable in money damages alone, and that Artist and/or Record Company shall, therefore, in the event of any such unauthorized dissemination, or threat thereof, be entitled to injunctive (and any other equitable) relief as may be necessary to prevent, remedy and/or mitigate the adverse effects of such actual or threatened dissemination, in addition to any legal remedies (including damages to which Artist and/or Record Company may be entitled and the recovery of court costs and attorneys' fees reasonably incurred in connection with obtaining such relief).   You expressly agree that, without limiting any other rights or remedies we may have, Artist and/or Record Company shall be entitled to recover any and all monies or other benefits whatsoever received by you or on your behalf from any and all sources in connection with any unauthorized use or dissemination by or on behalf of you of such Master(s) or any portion thereof and that any such monies or other benefits so received by you or on your behalf shall be held in trust, by you or on your behalf for immediate payment to Artist. The provisions of this paragraph 11 (h) are material terms of this Agreement.

## 12.   **INDEMNIFICATION**

**(a)**      You agree to indemnify and hold Artist, Record Company and their successors, assigns, agents, licensees, officers, directors, and employees harmless against any third-party claim, liability, cost and expense (including reasonable attorney's fees and legal costs) in connection with any claim which is inconsistent with any agreement, covenant, representation, or warranty made by you herein. You will reimburse Artist and/or Record Company upon demand for any payment by Artist and/or Record Company at any time after the date hereof (including after the term of this Agreement terminates) in respect of any claim, liability, damage or expense to which the foregoing indemnity relates.  Upon the making or filing of any such claim, action or demand, Artist and/or Record Company shall be entitled to withhold from any amounts payable under this Agreement such amounts as are reasonably related to the potential liability in issue.  Such amounts will be released to you should you post a bond in an amount equivalent to the sum being withheld by Artist in respect of any such claim with a good and sufficient surety, approved by Artist, in its sole discretion, provided such surety agrees conditionally, in writing, to pay all costs, fees, damages, etc. incurred by Artist and/or Record Company by reason of such claim. You shall be notified of any such claim, action or demand and shall have the right, at your own expense, to participate in the defense thereof with counsel of its own choosing; provided, however, that Artist's and/or Record Company's decision in connection with the defense of any such claim, action or demand shall be final.

**(b)**      Artist agrees to indemnify and hold you harmless against any third-party claim, liability, cost and expense (including reasonable attorney's fees and legal costs) in connection with any claim which is inconsistent with any agreement, covenant, representation, or warranty made by Artist herein.

## 13.   **FORCE MAJEURE**

Artist shall not be deemed in default hereunder if performance of its obligations hereunder is delayed or becomes impossible or commercially impractical, or if Artist or Record Company is hampered in the recording, manufacture, distribution or sale of phonograph records of Artist's or Record Company's normal business operations become commercially impractical, by reason of any force majeure event not reasonable within Artist's or Record Company's control or which Artist or Record Company could not by reasonable diligence have avoided.   Upon the happening of any such event, Artist, in addition to any other rights or remedies it may have hereunder or otherwise, may elect, by notice to you, to terminate its obligations under this Agreement or to suspend Artist's obligations under this Agreement for the period of time that the effects of any such force majeure event continue, provided however, that any such suspension of Artist's obligations under this Agreement shall be limited to a period of six (6) months.   Artist will not, however, suspend or terminate its obligations to account or pay royalties due hereunder unless the force majeure event prohibits Artist from doing so.

## 14.   **SUSPENSION AND TERMINATION**

If at any time you fail to fulfill any of your material obligations herein, then, without limiting Artist's rights, Artist shall have the option, exercisable at any time by notice to you, (i) to suspend Artist's obligations to you hereunder during the period of default and/or (ii) to terminate this Agreement without any further obligation to you hereunder.   No such suspension shall exceed six (6) months unless caused by your breach, by your refusal, failure or inability to comply with any of your obligations hereunder, or by events affecting a significant portion of the recording industry.   No such suspension shall suspend our obligation to render payments of accrued royalties hereunder unless such suspension is due to your breach of this Agreement or your refusal or failure to comply with any of your obligations hereunder.

## 15.   **CREDIT**

**(a)**   Provided you have fulfilled your material services hereun-der, Artist shall direct the Record Company to accord credit to you as a producer of the Master(s) as follows: (i) in the liner notes or elsewhere on the packaging of all records (in all configurations) embodying the Master(s) hereunder, and (ii) in all trade and consumer advertisements, including Billboard Magazine strip ads, which pertain exclusively to the Master(s) hereunder, that are one-quarter (1/4) page or larger in size, placed directly by Record Company, and appear in so-called "nationwide" trade publications in the United States.   Such credit shall be in substantially the following form:

"**Produced by MENACE**"

**(b)**   Notwithstanding the foregoing, no inadvertent failure by

Artist or Record Company or any other person or entity to comply with the credit provisions of this Agreement shall constitute a breach by Artist or Artist's obligations hereunder.  Artist will use reasonable efforts to instruct Record Company to correct any such inadvertent failure with respect to future runs of phonograph records or subsequent advertisements after our receipt of written notice from you with respect to any such failure; and

**(c)**      Notwithstanding anything to the contrary contained in this Agreement, in the event any of the Master(s) are produced by you jointly with a third-party or in the event any such third-party shall perform additional production services with respect to the Master(s) produced by you hereunder, Artist shall have the right to accord such third-party an appropriate credit in connection therewith. Artist and/or Record Company will use reasonable efforts to provide you with notice of Artist and/or Record Company's decision to engage a third party producer and/or re-mixer and you shall have the right to request that your name is removed from the credits that pertain to the Master(s), provided that our failure to so notify you shall not be deemed a breach of this Agreement.

## 16.   <u>FAILURE OF PERFORMANCE</u>

The failure by Artist to perform any of its obligations hereunder shall not be deemed a breach of this Agreement unless you give Artist written notice of such failure to perform and such failure is not corrected within thirty (30) days from and after receipt of such notice.

## 17.   <u>LEGAL AND EQUITABLE RELIEF</u>

Producer acknowledges that Producer's services hereunder, as well as the Master(s) recorded and the rights and privileges granted to Artist under the terms hereof, are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, and that, in the event of a breach by you of any material term, condition, representation, warranty, or covenant contained herein, Artist may be caused irreparable injury and damage.  You expressly agree that Artist may be entitled to seek the remedies of injunction and other equitable relief to prevent or remedy a breach of this Agreement, which relief shall be in addition to any other rights or remedies, for damages or otherwise, which Artist may have.

## 18.   <u>NOTICES</u>

The respective addresses of Artist and you for all purposes of this Agreement shall be as set forth above until notice of a new address shall be duly given. Any notice desired or required to be either given by either party to the other shall be in writing and shall be delivered by hand (to and officer if the addressee is a corporation), or sent by United States certified mail, postage prepaid, return receipt requested with all

charges prepaid, provided that any royalty statement may be sent by regular mail. Properly addressed notice delivered or sent as provided herein shall be deemed given when delivered by hand, or when postmarked if delivered by mail. Copies of all notices to Artist shall be sent to: Law Offices of Robert A. Celestin, Esq., 1650 Broadway, Suite 505A, New York, New York 10019, Attn: Robert A. Celestin, Esq. Copies of all notices to you shall be sent to The Gray Law Firm, LLC, 254 State Street, Hackensack, New Jersey 07601, Attn: Navarro W. Gray, Esq.

## 19.   <u>MISCELLANEOUS</u>

This Agreement cannot be cancelled, modified, amended or waived, in part or in full, in any way except by an instrument in writing signed by the party to be charged. No waiver by Artist or you whether express or implied, of any provision of this Agreement or any default hereunder shall affect the other's right to thereafter enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar. This Agreement shall be governed by and construed under the laws and judicial decisions of the State of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New York or the Federal District courts located in New York City. Should any paragraph or provision of this Agreement be held to be void, invalid or inoperative, such decision shall not affect any other paragraph or provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative paragraph or provision had not been contained herein.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the day and year first above written.

**AGREED TO AND ACCEPTED:**

**By**: _____            **By:** _____
     **SIDNEY SELBY**                                  **ADNAN KHAN**
     **p/k/a "DESIIGNER"**                          **p/k/a "MENACE"**

## EXHIBIT "A"

## ROYALTY ABSTRACTS

9.     **ROYALTIES**

9.01     In respect of all Exploitations of Records, Reproductions and Basic Works hereunder, during the term of copyright in each country concerned, UMG shall pay you a royalty computed by applying the applicable percentage rates set forth in this Article 9 ("**Royalty Rates**") on the terms set forth in this paragraph 9.01, to only one of the following: the Unit Price, UMG Revenues or Net Receipts (as applicable). For each accounting period described under paragraph 10.01, your royalty will be the amount (which may be a negative dollar amount) equal to:

(a)  in respect of all Exploitations described in this Article 9 for which there is an applicable Unit Price (except Special Exploitations), the product of (i) Net Sales for each Record, Reproduction or other work during such accounting period times (ii) the applicable Unit Price for such Record, Reproduction or other work times (iii) the applicable Royalty Rate for such Record, Reproduction or other work; plus

(b)  in respect of all Exploitations described in this Article 9 for which there is no applicable Unit Price (except Special Exploitations), the product of (i) UMG Revenues received by UMG during such accounting period for each applicable Exploitation; times (ii) the applicable Royalty Rate for such Exploitation; plus

(c)  in respect of only those Exploitations described in paragraph 9.13 ("**Special Exploitations**"), the product of (i) Net Receipts received by UMG during such accounting period for each applicable Special Exploitation; times (ii) the applicable Royalty Rate for such Special Exploitation; minus

(d)  the dollar amount of all royalties payable to producers and all other royalty participants, except (i) Mechanical Royalties for Physical Records and Permanent Downloads (other than Excess Publishing Royalties) and (ii) union "per-record" royalties.

9.02     (a)  The Royalty Rate for Exploitations of Records in the US at a Top-Line Price ("**US Basic Rate**") is as follows**:**

| Masters made during the: | US Basic Rate |
| --- | --- |
| Initial Period | |
| First Option Period | |
| Second Option Period | |
| Third Option Period | |
| Fourth Option Period | |
| Fifth Option Period | |
| Sixth Option Period | |

(b)  The Royalty Rate for Exploitations of Records outside the US at a Top-Line Price ("**Foreign Basic Rate**") is calculated as follows:

Territory                                                                    Foreign Basic Rate calculation

| | |
|---|---|
| Canada | [_]% of the applicable US Basic Rate |
| United Kingdom, Germany and Japan | [_]% of the applicable US Basic Rate |
| Rest of World | [_]% of the applicable US Basic Rate |

Any reference to "**Basic Rate**" herein means the US Basic Rate or the Foreign Basic Rate, as the context requires.

(c)  On Qualifying US Net Sales of any Commitment Album, your Royalty Rate will be the Basic Rate plus one-half of one percentage point for Qualifying US Net Sales of a particular Commitment Album in excess of 500,000 units and an additional one-half of one percentage point for Qualifying US Net Sales of such Commitment Album in excess of 1,000,000 units.

9.03     For Exploitations of Reproductions at a Top-Line Price, your Royalty Rate is the Basic Rate that applies to the first Commitment Album recorded hereunder.

9.04     (a)   Notwithstanding anything to the contrary in paragraphs 9.01-9.03, your Royalty Rate on the following types of Exploitations will be: (i) three-fourths of the Basic Rate on (A) soundtrack Records, (B) so-called "audiophile" Records, (C) EPs and Singles in Physical Record Formats, (D) Records in a new Format that constitutes less than 25% of the number of UMG's Records exploited in the Territory concerned and the accounting period concerned and (E) any other Records for which the manufacturing cost exceeds 125% of the then-current cost of such Record in standard CD Format; (ii) two-thirds of the Basic Rate on Midline Records (and equivalently priced Reproductions) and on Records sold to a national, state or local government, or to any Person for re-sale on a US Armed Forces Post Exchange; and (iii) one-half of the Basic Rate on Budget Records (and equivalently priced Reproductions), Premium Records and any custom Record created by the "special markets" or "special products" division of UMG (which is primarily responsible for licensing the third-party use of UMG's catalog of Recordings and Records in the relevant territory) for such division's client.

9.05     With respect to Bundles, your Royalty Rate will be determined by taking into account UMG's direct and indirect costs attributable to and generated by the Exploitation of such Bundle and UMG's stand-alone Unit Price for and the Royalty Rate applicable to each element contained in such Bundle.

9.06     If UMG receives a payment from a third party that is solely attributed to (a) the leasing of commercial advertising space on a UMG Artist Website, (b) hyperlinks in Ancillary Material or on a UMG Artist Website to e-commerce Websites owned or controlled by third parties or (c) the Exploitation of any Basic Work or other item that relates specifically to Artist (or content created or services performed by Artist) for which a royalty is not otherwise provided in this Article 9 (e.g., UMG Tickets), your Royalty Rate will be the applicable Basic Rate, which will be applied to the Unit Price (and if there is no Unit Price, to the UMG Revenues) from the relevant Exploitation.

9.07     With respect to any Record or Reproduction not consisting entirely of Masters or other Basic Works (e.g., multi-artist compilations), the Royalty Rate will be computed by multiplying the otherwise applicable Royalty Rate (i.e., the rate that would apply if the applicable Record or Reproduction consisted entirely of Masters or other Basic Works) by a fraction, the numerator of which is the number of Masters or other Basic Works embodied on such Record or Reproduction and the denominator of which is the total number of Recordings or other works (including such

Masters and other Basic Works) contained on such Record or Reproduction. For any Record (other than a Bundle) consisting of Masters or other Basic Works hereunder where the various Masters or other Basic Works bear different royalty rates, the otherwise applicable Royalty Rate for each Master or other Basic Work will be prorated on the basis of the total number of Masters or other Basic Works embodied on such Record. For all Joint Masters, the Royalty Rate will be the otherwise applicable Royalty Rate divided by the number of Persons to whom UMG is obligated to pay a royalty (including you).

9.08    No royalties will be payable in respect of Masters, Records or Reproductions: (a) furnished on a no-charge basis, sold or otherwise distributed to disc jockeys, publishers, employees of UMG or Affiliate/Principal Licensees, motion picture companies, radio or television stations or other customary recipients of free, discounted or promotional Records; (b) sold or otherwise distrib-uted at close-out prices, for scrap or at less than inventory cost or for less than 50% of the Record's Top-Line Price; (c) constituting "server copies" or other incidental copies; (d) in Album Configuration at a Unit Price of $3.00 or less; or (e) comprised solely of an excerpt of a Recording of 90 seconds or less in duration.

9.09    Notwithstanding anything to the contrary contained herein, in jurisdictions where a statutory, regulatory, collective bargaining or other similar rule governs the distribution of monies for a specific type of exploitation of Masters or Records hereunder (e.g., internet webcasting and satellite radio in the US) ("**Governing Rule**"), no royalty will be payable to you under this Article 9 (and UMG will have no obligation to collect any such amounts on your behalf); provided, however, that if UMG receives any monies in the US under a Governing Rule that are expressly designated by the payor as monies for your sole benefit, UMG shall credit your account with the amount of such monies, less any portion thereof that is payable by UMG to producers or any other Person. UMG will have no obligation to credit your account with or pay to you any portion of the money UMG receives pursuant to a Governing Rule that is payable to the owner of the applicable Recordings or other works under any such Governing Rule (e.g., the so-called "producer's share," "company share" or "label share").

9.10    Notwithstanding anything to the contrary contained herein, no royalties or other compensation will be payable to you or Artist in connection with any payments received by UMG (a) under any agreement between UMG and a third party where such payments (i) are not solely and directly attributed to the exploitation of a particular Master, Record, Reproduction or other Basic Work hereunder (including, e.g., payments received under a "blanket agreement" between UMG and a third party where the third party is granted access to all or a significant portion of UMG's catalog of Recordings, Records or other materials) or (ii) constitute unrecouped or un-earned advances or unfulfilled or unredeemed guarantees or the like; (b) pursuant to any statute or other Law (other than as provided in paragraph 9.09 above); or (c) as an incidental or similar fee to defray any Preparation and Delivery Costs.

9.11    Without limitation, each of the following will be deemed to be one Record for all purposes hereof, including the calculation of Net Sales and royalties payable hereunder: (a) a Multi-Format Record; and (b) all Stems comprising a single Track that are Exploited together as a single unit.

9.12    UMG may elect from time to time to compute and pay you royalties hereunder on a royalty basis different than that provided herein or on a different royalty cycle (no less than semi-annually); provided that, at the time of such adjustment to the royalty basis, the resulting royalty is substantially the same net amount that would otherwise be payable to you at that time hereunder. Without limitation of the foregoing, in calculating the amount of applicable Discounts used to compute your royalties hereunder, UMG may elect from time to time to convert actual discounts to an equivalent number of "no charge" or "free goods" Records or Reproductions (or vice versa).

9.13    With respect to the following uses of Masters and other works pursuant to licenses granted by UMG or Affiliate/Principal Licensees to third parties, your Royalty Rate will be 50%,

which will be applied to the Net Receipts from such Exploitation: (a) the inclusion of a Master in (i) Physical Records sold through a record club not operated by UMG or an Affiliate/Principal Licensee or (ii) a multi-artist compilation of Recordings (e.g., a soundtrack album) sold by a third-party record label or film company; or (b) the use of a Master (i) in synchronization with motion pictures, television programs, Internet programs, commercials or video games, or (ii) in the form of a "sample" embodied in a third-party recording artist's Recording. Notwithstanding anything to the contrary in this paragraph 9.13, no royalty payable under paragraph 9.13(a) will exceed the royalty that would otherwise have been payable to you hereunder if UMG or an Affiliate/Principal Licensee in the applicable territory had itself distributed or otherwise exploited the Records concerned.  The "third parties" described in the first sentence of this paragraph 9.13 exclude Affiliate/Principal Licensees, retailers, digital service providers, customers and the like.  Notwithstanding anything to the contrary contained herein, arrangements with third parties that involve Masters embodied in user-generated content (e.g., YouTube) do not constitute Special Exploitations and will not require your approval.

11.    **LICENSES FOR MUSICAL COMPOSITIONS**

11.01    You and Artist hereby grant UMG and all Affiliate/Principal Licensees an irrevocable, perpetual non-exclusive license under copyright to reproduce, in whole or in part, each Controlled Composition on Masters and Records in all Configurations and Formats, and to reproduce, distribute, publicly perform and communicate to the public, Masters and Records in all Configurations and Formats throughout the Territory on the terms set forth in this Article 11. You and Artist agree that such license may be sublicensed by UMG as reasonably necessary to allow the Exploitation of Records and other exploitation of Masters as contemplated herein.

11.02    In the US and Canada, subject to paragraphs 11.02(c) and (d), on Exploitations of audio Physical Records and Permanent Downloads at a Top-Line Price, UMG will pay you or your designee Mechanical Royalties for each Controlled Composition at the following rates (each, a "**Controlled Rate**"):

(a)  On Records distributed in the US, 75% of the minimum compulsory license rate under Section 115 of the US Copyright Act (or any successor legislation) for Records in the applicable Format and Configuration, without regard to playing time ("**US Minimum Statutory Rate**"), in effect at the time of Delivery or scheduled Delivery under paragraph 3.03 of the Master concerned, whichever is lower ("**Copyright Fixing Date**"); provided, however, if, at any time, US copyright law does not provide for a minimum compulsory rate, the US Controlled Rate will be deemed to be the minimum license rate, without regard to playing time, agreed to by the major record companies and major music publishers in the US in effect on the Copyright Fixing Date.

(b)  On Records distributed in Canada, if the copyright law in Canada provides for a minimum compulsory license rate for the reproductions and distribution of Records, 75% of the Canadian compulsory license rate, without regard to playing time, in effect on the Copyright Fixing Date; provided, however, that: (i) if, at any time, the copyright law of Canada does not provide for a minimum compulsory rate, the Canadian Controlled Rate will be deemed to be the minimum license rate, without regard to playing time, agreed to by the major record companies and major music publishers in Canada in effect on the Copyright Fixing Date ("**Agreed Canadian Rate**"); (ii) if there is no Agreed Canadian Rate, the Canadian Controlled Rate will be $0.05 (Canadian) per Composition; and (iii) notwithstanding anything to the contrary in this paragraph 11.02(b), in no event will the Canadian Controlled Rate exceed the applicable US Controlled Rate.

(c)  The Controlled Rate for Controlled Compositions embodied in Records described in paragraphs 9.04, 9.07 and, where applicable, 9.13 will be 75% of 75% of the otherwise applicable rate. The total Mechanical Royalty payable to you or Artist or any other Person for all Compositions (including Controlled Compositions and non-Controlled Compositions)

on any Record may not exceed the following ("**Mechanical Ceiling**"): (i) on a Single, two times the Controlled Rate; (ii) on an EP, five times the Controlled Rate; (iii) on an Album (other than the type of Records described in clause 11.02(c)(iv)), ten times the Controlled Rate; and (iv) with respect to Bundles, not more than (A) the sum of the maximum Mechanical Royalties that would be otherwise be payable hereunder in respect of each Record or other component contained within the Bundle if each such Record or component had been sold separately at a Top-Line Price, <u>multiplied by</u> (B) a fraction, the numerator of which is the sum of the Unit Prices of all such Records or other components when sold as part of such Bundle, and the denominator of which is the sum of the Top-Line Prices associated with such Records or other components when each Record or other component is sold separately. Any amounts in excess of the applicable Mechanical Ceiling will constitute Overages.

(d)  Mechanical Royalties are payable on 85% of Net Sales, subject to the other terms of this Article 11. Mechanical Royalties will not be payable with respect to (i) Records for which no royalties are payable under Article 9, (ii) nonmusical material, (iii) Recordings of two minutes or less in duration, (iv) "intros", "interludes", "skits" or similar Compositions, or (v) more than one use of any one Composition or part thereof (e.g., Stems) per Record, including Multi-Format Records (and, for the purposes of this Article 11, the inclusion in a Record of a Composition and one or more different adaptations of such Composition (e.g., remixes, etc.) is deemed to be one use of such Composition in that Record). No Mechanical Royalties will be payable in respect of Compositions in the public domain or arrangements of Compositions in the public domain, except that, if such arrangement is credited by ASCAP or BMI, the Mechanical Royalty otherwise payable hereunder will be apportioned in the same ratio used by ASCAP or BMI in determining the credits for public performance of the work if you furnish UMG with satisfactory evidence of that ratio. Notwithstanding anything to the contrary contained in this paragraph 11.02, with respect to "digital phonorecord deliveries" in the US, unless applicable law permits payment at the rates provided for in this paragraph 11.02, Mechanical Royalties will be payable for each Controlled Composition at the minimum applicable rate established by applicable US law or otherwise agreed to by UMG and any relevant music publisher/administrator, collecting society or agency.

(e)  The license granted under paragraph 11.01 includes the right to reproduce any Controlled Composition in connection with any ETR as an incidental copy or in the form of server copies or other transient copies (to the extent such use is not otherwise licensed under a compulsory or voluntary license). Royalties due for the right to make a public performance or synchronization use of a Composition do not constitute Mechanical Royalties hereunder.

(f)  UMG shall compute Mechanical Royalties on Controlled Compositions as of the end of each calendar quarter-annual period in which there are Exploitations of Records on which Mechanical Royalties are payable to you (i.e., Exploitations for which UMG has been paid or finally credited). On or before the next May 15, August 15, November 15 or February 15, UMG shall send or make available a statement covering those royalties and pay any net royalties then due. Mechanical Royalty reserves maintained by UMG against anticipated returns and credits may be held for a reasonable period of time. If UMG makes any overpayment of Mechanical Royalties on Controlled Compositions, such overpayment will constitute an Overage. Except as otherwise provided in this paragraph 11.02(f), the terms of Article 10 shall apply to the payment of Mechanical Royalties for Controlled Compositions hereunder. The obligation to account and pay Mechanical Royalties on Exploitations of Records outside of the US will be that of Affiliate/Principal Licensees (and no Mechanical Royalties will be payable in the US in respect of such Exploitations). The terms applicable to the calculation and payment of Mechanical Royalties on all Controlled Compositions reproduced and distributed on Records outside of the US and Canada will be no less favorable to UMG or Affiliate/Principal Licensees than the terms prevailing on a general basis in the country concerned with respect to the use of Compositions on comparable Records.

11.03   (a)  Without limiting the generality of paragraph 11.01, but subject to the payment terms in paragraph 11.03(b), you and Artist hereby grant UMG and Affiliate/Principal Licensees, throughout the Territory, an irrevocable, perpetual non-exclusive license under copyright to (i)

synchronize and otherwise use, in whole or in part, each Controlled Composition in AV Masters, AV Records embodying such AV Masters, and in advertisements for Artist, any Basic Works, Records and other Reproductions hereunder (including "EPKs" and, if applicable, on or in UMG Artist Websites, UMG Artist Website Material and Ancillary Material); and (ii) reproduce, manufacture, distribute and otherwise exploit such Basic Works, AV Records and advertisements in all Configurations and Formats known now or in the future, and to publicly perform them and communicate them to the public in any manner (including for profit), all by any method known now or in the future; and, in each case, to authorize others to do the foregoing. Neither UMG nor Affiliate/Principal Licensees, or their respective designees, will be required to make any payment in connection with such uses, and the license hereunder will apply whether or not UMG receives any payment in connection with any use of any AV Master or other applicable Basic Work, or AV Record. At UMG's request, you shall cause the issuance of the foregoing rights with respect to any non-Controlled Compositions embodied in Masters. If any exhibition of an AV Recording, AV Record or advertisement (or other applicable Basic Work) is also authorized under another license [granted to a Person other than UMG] (such as a public performance license granted by ASCAP or BMI), that exhibition will be deemed authorized by that license instead of this agreement. (In all events, UMG and Affiliate/Principal Licensees will have no liability by reason of any such exhibition.)

(b)  Notwithstanding anything to the contrary in paragraph 11.03(a), if UMG recoups all costs incurred with respect to an AV Master hereunder, then, at your written request, UMG will pay you or your designee a royalty with respect to each Controlled Composition embodied in such AV Master, on Net Sales of AV Records embodying such AV Master that occur after such recoupment (i.e., on a prospective basis only), equal to the lesser of (i) 6% of the Unit Price of the applicable AV Record divided by the number of Compositions contained in the AV Master concerned (including the Controlled Composition concerned) and (ii) $0.06, prorated by multiplying the amount of such royalty by the percentage of the applicable Controlled Composition that is controlled by you or Artist. Notwithstanding anything to the contrary in the immediately preceding sentence, if the playing time of the performance of the applicable Controlled Composition in the AV Master concerned is less than three minutes, the royalty in respect of such Controlled Composition will be equal to the royalty that would otherwise be payable pursuant to this paragraph 11.03(b), multiplied by a fraction, the numerator of which is the playing time in seconds of the performance concerned, and the denominator of which is 180.

(c)  For purposes of paragraph 11.03(b): (i) regardless of the number of times a Controlled Composition is used in an AV Record, the royalty payable thereunder shall only be paid for one such use; and (ii) regardless of the number of Compositions embodied in an AV Record (including Controlled Compositions and non-Controlled Compositions), the aggregate royalty for all such Compositions will not exceed 6% of the Unit Price of such AV Record.

11.04    You and Artist hereby grant UMG and Affiliate/Principal Licensees, throughout the Territory, the perpetual and irrevocable license under copyright, and without liability to any Person, to print, reproduce or otherwise recreate the title and lyrics to each Controlled Composition embod-ied, in whole or in part, in a Master for all purposes hereunder (including in connection with UMG Artist Websites, UMG Artist Website Material, Ancillary Material and in the Artwork, Art Materials and packaging for Records hereunder), without payment or other liability to you, Artist or any other Person.

11.05    If any Recordings made hereunder contain copyrighted Compositions that are not Controlled Compositions, you and Artist shall use reasonable efforts to obtain copyright licenses covering those Compositions for UMG's benefit on the same terms as those that apply to Controlled Compositions under this Article 11 (including, if UMG requests, for the right to reproduce such Compositions in Masters and Records, and to distribute, publicly perform and communicate to the public those Records in countries outside the US and Canada throughout the Territory on terms that are standard and customary in the applicable country). Without limitation of the foregoing in this paragraph 11.05, in all events, you and Artist shall obtain copyright licenses covering such non-

Controlled Compositions for (a) the US, providing for Mechanical Royalties at no greater than the US Minimum Statutory Rate, and (b) Canada, providing for Mechanical Royalties at no greater than the lowest rates prevailing in Canada on a general basis with respect to the use of Compositions on Records as set forth under 11.02(b).

11.06    Any assignment made of the ownership of copyright in, or the rights to license or administer the use of, any Controlled Composition must be made subject to the provisions of this Article 11.

11.07    If UMG is required to pay any music publishing royalties hereunder in excess of the amounts (including any gratis amounts) set forth in this Article 11, or if the copyright holder of any Composition fails to grant UMG any of the licenses required under this Article 11, any excess payments made by UMG in connection therewith ("**Excess Publishing Royalties**") will constitute Overages and all Losses suffered by UMG or other UMG Indemnified Parties will be subject to your indemnification obligations under paragraph 15.07.

11.08    Notwithstanding anything to the contrary in this Article 11: (a) if the reproduction, distribution, public performance or synchronization rights with respect to a particular use of a Controlled Composition is covered by the license granted herein and one or more other applicable licenses, the rate payable by UMG or its designee for the use of the Controlled Composition will be the rate contained in the license bearing the lowest royalty; and (b) if a Person other than UMG agrees, pursuant to a written agreement between such Person and you or Artist (or your or Artist's music publishing designee), to pay you or Artist (or your or Artist's respective designee) Mechanical Royalties or other music publishing royalties that UMG would otherwise be obligated to pay you hereunder, UMG will not be obligated to pay such Mechanical Royalties or other music publishing royalties.

11.09    With respect to each Controlled Composition, neither you nor Artist shall grant to any Person other than UMG: (a) a so-called "first use" mechanical license; or (b) a voluntary mechanical license prior to the date one year after the initial commercial release hereunder of the applicable Master embodying such Controlled Composition.  With respect to each Composition (including any Controlled Composition) embodied in a Master, you shall cause each Person who has a publishing interest in such Composition to refrain from granting to any person other than UMG: (i) a so-called "first use" mechanical license; or (ii) a voluntary mechanical license prior to the date one year after the initial commercial release hereunder of the applicable Master embodying such Composition.

**EXHIBIT "B"**

**LETTER OF DIRECTION**

**SIDNEY SELBY p/k/a "DESIIGNER"**
**c/o Law Offices of Robert A. Celestin, Esq.,**
**1650 Broadway, Suite 505A**
**New York, New York 10019**

Dated as of April ____, 2016

Getting Out Our Dreams, Inc./
Def Jam Recordings
A Division of UMG Recordings, Inc.
1755 Broadway
New York, New York 10019

Ladies and Gentlemen:

1.      Pursuant to that certain producer agreement dated as of April _____, 2016 (the "Producer Agreement") to which this exhibit is attached, I have engaged **ADNAN KHAN p/k/a "MENACE"** ("Producer") in connection with the production of one (1) master recording entitled "PANDA" (the "Master(s)") featuring my performances, pursuant to the agreement between you and me dated as of February 1, 2016 (the "Recording Agreement").

2.      Although the Recording Agreement requires me to pay Producer in connection with the Master(s), I hereby request and authorize you to make payments to the Producer on my behalf, as follows:

(a)      A producing advance in the amount of One Hundred ($100.00) Dollars (the "Advance"), payment of which is hereby acknowledged.  The Advance will be recoupable by you from any and all monies becoming payable to the Producer under subparagraph 2(b) below or otherwise.  To the extent not so recouped, the Advance may be recouped by you from any monies becoming payable to me, but all amounts so recouped from monies payable to me will be credited to my royalty account if subsequently recouped from monies payable to the Producer.  The Advance will also be applied against the recording budget applicable to the Master(s) under the Agreement.

(b)      (i)      A producing royalty (the "Royalty") on net sales of sound-only phonograph records derived from the Master(s), computed, adjusted and paid on the

D:/Desiigner/Adnan Khan/Producer Agmt 4/20/16 (execution)

26

same basis, in the same manner, and subject to the same conditions as the royalty payable to me under the Recording Agreement, excluding any escalation provisions, at the same times and subject to the same conditions, but at a basic album rate on top-line net sales through normal retail channels in the United States ("USNRC") of three (3%) percent instead of the rate fixed in the Recording Agreement, with proportionate reductions on all sales for which reduced royalties are payable under the Recording Agreement.  In the event USNRC net sales shall exceed five hundred thousand (500,000) units, the royalty shall increase prospectively by one-half (1/2%) percent to three and one-half (3 1/2%) percent of the retail price.  In the event USNRC net sales shall exceed one million (1,000,000) units, the royalty shall increase prospectively by one-half (1/2%) percent to four (4%) percent of the retail price.  The amount of the Royalty will be deducted from all monies payable or becoming payable to me under the Agreement.

(ii)     The Royalty will not be payable until you have recouped all recording costs attributable to the album concerned, whether or not any particular Master is contained on the album. Such recoupment of recording costs will be computed at my net royalty rate (i.e., the royalty rate under the Recording Agreement less the aggregate royalty rate applicable to the producers of the album).  After such recoupment, the Royalty will be computed and paid from the first phonograph record sold, subject to recoupment of the Advance.

(iii)     Further, solely as an accommodation to Producer, Producer hereby authorizes and directs that five (5%) percent of the Royalty due to him (i.e., 0.15%) be payable to his attorney, Navarro W. Gray, Esq., at 254 State Street, Hackensack, NJ 07601 ("Attorney").  All payments to Attorney will constitute payment to Producer, and Record Company will not be held liable for any erroneous payments made in connection with this authorization, nor shall Record Company be liable for its failure to comply with this authorization.

3.     I hereby request and irrevocably authorize you to accord Producer, on my behalf, credit as a producer of the Master(s) as follows: (i) in the liner notes or elsewhere on the packaging of all records (in all configurations) embodying the Master(s) hereunder, and (ii) in all trade and consumer advertisements, including Billboard Magazine strip ads, which pertain exclusively to the Master(s) hereunder, that are one-quarter (1/4) page or larger in size, placed directly by Record Company, and appear in so-called "nationwide" trade publications in the United States.  Such credit shall be in substantially the following form:

**"Produced by MENACE"**

4.     Your compliance with this authorization will constitute an accommodation to me alone; Producer is not a beneficiary of it.  All payments to Producer under this authorization will constitute payment to me, and you will have no liability whatsoever by reason of any erroneous payment or failure to comply with this authorization.  You shall have the right to rely upon our written notice directing you to stop payments to Producer

hereunder; and upon your receipt of any such notice from us, you shall have the right to withhold all such payments or other monies payable to Producer hereunder.  I will indemnify and hold you harmless against any claims asserted against you and any damages, losses or expenses you incur by reason of any such payment or otherwise in connection herewith.

5.      All monies becoming payable to Producer under this authorization will be remitted to Producer at the following address: The Gray Law Firm, LLC, 254 State Street, Hackensack, New Jersey 07601, Attn:  Navarro W. Gray, Esq. or otherwise as Producer may direct you in writing.

All royalty payments will be accompanied by statements with respect to those payments. (I understand that royalty payment instructions of this nature are usually placed in effect with respect to the accounting period in which you receive them if they are delivered to you within the first three months of that period, and with respect to the next accounting period if delivered after that time, although administrative factors may result in variations from that procedure.)

Very truly yours,

By:_____

**SIDNEY SELBY**
**p/k/a "DESIIGNER"**

## EXHIBIT "C"

### SOUND EXCHANGE

### LETTER OF DIRECTION

Solely as a service and accommodation to those featured artists entitled to royalties under 17 U.S.C. § 114(g)(2)(D) who specifically authorize SoundExchange to collect and distribute royalties on their behalf, SoundExchange permits such featured artists to designate that a percentage of the royalties due them from SoundExchange relating to certain sound recordings be remitted to creative personnel credited or recognized publicly for the commercially released sound recording on which the featured artist performs or other usual and customary royalty participants in such sound recording.

To make such a designation, the featured artist submitting this Letter of Direction must submit to SoundExchange a (1) Designation & Authorization for Featured Artist and (2) completed Internal Revenue Service ("IRS") Form W-9 Request for Taxpayer Identification Number and Certification.

Please note that a featured artist need not execute this Letter of Direction in order to be paid statutory royalties by SoundExchange.

Name of Featured Recording Artist ("Artist"):   SIDNEY SELBY p/k/a "Desiigner"

Artist's SoundExchange ID Number (if known):   _____

Name of Payee ("Payee"): ADNAN KAHN _____

Payee Address:   c/o The Gray Law Firm, LLC, 254 State St., Hackensack, NJ 07601

Payee Telephone Number:  (201) 342-4064 _____

Payee Fax Number:  (201) 336-9098_____

Payee E-Mail:  navarro@TheGrayFirmNJ.com _____

Payment Percentage ("Percentage"):   _____ 17.64% _____

**X--**New Letter of Direction                  Amendment Revoking Previous Letters of Direction

By signing this Letter of Direction and submitting it to SoundExchange, Artist agrees as follows:

1. Artist represents and warrants that Artist is the featured recording artist who performed on the sound recording(s) identified on the "Repertoire Chart" attached hereto as Schedule 1 (the "Recordings").

2. Artist represents and warrants that Payee is an individual credited or recognized publicly for the commercially released sound recording identified on the Repertoire Chart or is another usual and customary royalty participant in such sound recording.

3. Artist requests and authorizes SoundExchange to pay to and in the name of Payee an amount equal to Percentage of the royalties otherwise payable by SoundExchange to Artist in respect of the Recordings, thereby reducing the payments from SoundExchange to Artist. If the box above labeled "Amendment Revoking Previous Letters of Direction" has been checked or if a previous "Royalty Distribution Information for Featured Artist" or other letter of direction has been provided to SoundExchange that conflicts with this Letter of Direction, then any and all previous letters of direction or similar documents conflicting herewith are hereby revoked.

4. All monies becoming payable under this Letter of Direction shall be remitted to Payee at the address identified above or as Payee otherwise directs SoundExchange in writing. If SoundExchange requires additional information (e.g., Payee tax information) to remit payments under this Letter of Direction, then Artist and Payee shall be responsible for providing SoundExchange with such information promptly. To the extent SoundExchange is not provided with sufficient or correct information to remit payment to Payee, or checks mailed to Payee's last known address are returned, SoundExchange may hold the monies pending receipt of such information or pay the royalties to Artist.

5. SoundExchange will honor a written revocation by Artist of the designation made by this Letter of Direction. In the event of such a revocation, SoundExchange may, but need not, mail notice of the revocation to the last known address of Payee. The foregoing is without prejudice to any other contractual arrangements between Artist and Payee requiring payment of the Percentage by Artist. SoundExchange has no responsibility for Artist's performance or nonperformance of any such obligation.

6. SoundExchange may discontinue making payments under this Letter of Direction at any time, including if checks mailed to Payee's last known address are returned, Artist ceases to be a member of SoundExchange, or SoundExchange modifies its policies concerning letters of direction. If it does so, then SoundExchange may, but need not, mail notice thereof to the last known address of Artist and Payee, and monies that otherwise would have been payable under this Letter of Direction will be paid to Artist.

7. Artist acknowledges that SoundExchange is providing payments to Payee solely as an accommodation to Artist but that all royalties distributed by SoundExchange to Payee are taxable to Artist. Artist shall be solely responsible for providing Payee with tax paperwork required by any governmental agency, including the Internal Revenue Service, and SoundExchange shall have no obligation to provide such information to Payee.

8. SoundExchange may rely conclusively, and shall have no liability when acting, upon any written notice, instruction, other document or signature that is reasonably believed by SoundExchange to be genuine and to be authorized by Artist. SoundExchange shall not be responsible for failure to act as a result of causes beyond the reasonable control of SoundExchange. SoundExchange shall not be liable to Artist, Payee or to any third

D:/Desiigner/Adnan Khan/Producer Agmt 4/20/16 (execution)

party for, and Artist agrees to defend (with counsel satisfactory to SoundExchange), indemnify and hold harmless SoundExchange from, any damages or loss (including reasonable attorney's fees) in any way related to this Letter of Direction, unless such loss is caused by SoundExchange's gross negligence or willful misconduct. The provisions of this Paragraph 8 shall survive the revocation or other termination of this Letter of Direction.

9. This Letter of Direction shall be governed by and construed in accordance with the substantive laws of the District of Columbia. Any dispute relating to or arising from this Letter of Direction shall be subject to the exclusive jurisdiction of courts sitting in the District of Columbia.

ACKNOWLEDGED AND ACCEPTED BY:


Signature: _____
Printed Name:  Sidney Selby_____
Address: c/o the Law Offices of Robert A. Celestin, Esq.,

_____1650 Broadway, Suite 505A_____

City, State, Zip Code:  New York, NY 10019_____

Date: _____

## SCHEDULE "A"

| Composition | Songwriters | % Copyright Ownership | Perf. Rights Org. |
|---|---|---|---|
| **PANDA** | **SIDNEY SELBY** | **70%** | **L.O.D Publishing, Inc. (BMI)** |
| | **ADNAN KHAN** | **30%** | **AK Menace Publishing (ASCAP)** |

      If any Proprietary Materials are contained in any Composition listed above, and the copyright Owner(s) (e.g., the music publishers) of such Proprietary Materials are entitled to a percentage ownership interest in such Composition and the copyright therein (the "Third Party Interest"), then the undersigned expressly agrees that the provisions of paragraph 11(g) of the Agreement to which this Schedule "A" is annexed shall govern as to the undersigned's responsibility, if any, for such Third Party Interest.

**AGREED TO AND ACCEPTED:**

**By:**_____
      **ADNAN KHAN p/k/a "MENACE"**

| Form **W-9**<br>(Rev. October 2007)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | Give form to the<br>requester. Do not<br>send to the IRS. |

**Print or type**
**See Specific Instructions on page 2**

Name (as shown on your income tax return)

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor   ☐ Corporation   ☐ Partnership
☐ Limited liability company. Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) ▶ .........
☐ Other (see instructions) ▶                                                                    ☐ Exempt payee

Address (number, street, and apt. or suite no.)                     Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

**Part I** **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number

**Part II** **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. See the instructions on page 4.

**Sign Here**   Signature of
U.S. person ▶                                                Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

● An individual who is a U.S. citizen or U.S. resident alien,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

● An estate (other than a foreign estate), or

● A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

● The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X                                        Form **W-9** (Rev. 10-2007)

# Signature Certificate



 Document Reference:   8CBD8JI94IZTAI4SHJ4JP5



**Adnan Khan**
Party ID: 5U3GA8IMTJ9EEIXPYV6KA7
IP Address: 94.197.120.122

VERIFIED EMAIL: menacemakesbeats@gmail.com



Multi-Factor
Digital Fingerprint Checksum   d4e65e3f39d56886470c1ff0d09f59ae84699d9d

---



**Navarro W. Gray, Esq.**
Party ID: NYRUPLJXSLCACHBHHI7RFD
IP Address: 69.115.239.183

VERIFIED EMAIL: navarro@entlegal.us

Multi-Factor
Digital Fingerprint Checksum   ce046c0cb39536a6687f176a2fc0d1c66349e17c



| Timestamp | Audit |
|---|---|
| 2016-07-01 12:32:40 -0700 | All parties have signed document. Signed copies sent to: Adnan Khan, Daniel Desire, and Navarro W. Gray, Esq.. |
| 2016-07-01 12:32:40 -0700 | Document signed by Navarro W. Gray, Esq. (navarro@entlegal.us) with drawn signature. - 69.115.239.183 |
| 2016-07-01 10:20:27 -0700 | Document signed by Adnan Khan (menacemakesbeats@gmail.com) with drawn signature. - 94.13.40.2 |
| 2016-07-01 09:33:25 -0700 | Document viewed by Adnan Khan (menacemakesbeats@gmail.com). - 94.197.120.122 |
| 2016-06-30 16:09:47 -0700 | Document viewed by Navarro W. Gray, Esq. (navarro@entlegal.us). - 69.115.239.183 |
| 2016-06-30 16:09:47 -0700 | Document created by Navarro W. Gray, Esq. (navarro@entlegal.us). - 69.115.239.183 |



This signature page provides a record of the online activity executing this contract.

**Page 1 of 1**



**GRAY LAW**

NAVARRO W. GRAY

THE GRAY LAW FIRM
A LIMITED LIABILITY COMPANY
254 STATE STREET
HACKENSACK, NEW JERSEY 07601
201-342-4064

♦

FAX
201-336-9098

E-MAIL: Navarro@TheGrayFirmNJ.com
WEB SITE: www.entlegal.us

February 4, 2016

VIA EMAIL BOB@RACLAWFIRM.COM
The Law Offices of Robert A. Celestin
1650 Broadway, Suite 505A
New York, NY 10019

## ADDENDUM TO PRODUCER'S DECLARATION
## ADNAN KHAN t/p SIDNEY SELBY p/k/a "DESIIGNER" DATED
## AS OF NOVEMBER 13, 2015

The undersigned **ADNAN KHAN c/o The Gray Law Firm, LLC, 254 State Street, Hackensack, New Jersey 07601** ("Producer") has been engaged to produce master recording(s) entitled**"THE MENACE'"' a/k/a "PANDA"** (the "Master") which features the performances of **SIDNEY SELBY p/k/a "DESIIGNER"** c/o **The Law Offices of Robert A. Celestin, 1650 Broadway, Suite 505A New York, NY 10019** ("Artist').

Whereas, the Producer and Artist have previously entered into a Producer's Declaration dated November 13, 2015, and this Addendum shall amend the November 13, 2015 Producer's Declaration until the Parties execute in good faith a Long Form Producer's Agreement; and

Whereas, consideration of the sum of One Hundred ($100.00) Dollars was paid to Producer, receipt of which is hereby acknowledged, and f o r other good and valuable consideration the parties agree as follows:

1.      Producer shall immediately, following the execution of this Addendum, supply Artist with the session files of the Master;

2.      Producer shall retain, own and control thirty (30%) percent of the copyright in and to the underlying composition ("Composition") and any and all other rights associated with same and Artist shall retain, own and control seventy (70%) percent of the copyright in and to the Composition, and any of all other rights associated with same. Producer shall receive a mechanical royalty rate of seventy-five (75%) percent of the current statutory rate in the U.S. and

Desiigner\Adnan Khan\Addendum to Producer's Declaration\020416

*THE GRAY FIRM*

Bob Celestin, Esq.
February 4, 2016
Page 2

Canada as of the date of the commercial release of the Master.

3.      For the further avoidance of doubt, Artist shall retain one hundred (100%) percent ownership interest in and to the copyright to the Master on a "work made for hire" basis.

4.      Artist shall direct and cause any and all Third Parties to grant Producer credit as follows: "Produced by Menace";

5.      Producer shall be entitled to a three (3%) percent producer royalty rate with one half of one (.5%) percent escalation for gold and an additional one half of one (.5%) percent escalation if the Master goes platinum;

6.      So long as Producer submits a Master(s) that is commercially satisfactory to Artist and Distributor during the recording of Artist's First Album, Producer shall be guaranteed a minimum of one (1) placement on Artist's First Album and in no event shall the Producer Fee and Producer Royalty for any such Master exceed Three Thousand ($3,000) Dollars and three (3%) percent (with escalations), respectively.

7.      Producer shall return Two Thousand ($2,000.00) Dollars to Artist within seven (7) days of the date of this Addendum. Failure to do shall render this Addendum null and void.

8.      Except as otherwise expressly provided in this Addendum, all of the terms and conditions of the Producer's Declaration are hereby ratified and confirmed.

Agreed to and Accepted
On Producer's Behalf
BY:
        Navarro W. Gray, Esq.

Agreed to and Accepted
On Artist's Behalf
BY:
        Robert A. Celestin, Esq.

Desiigner\Adnan Khan\Addendum to Producer's Declaration\020416

2



# PRODUCER'S DECLARATION

## ADNAN KHAN t/p SIDNEY SELBY p/k/a "DESIIGNER"/
## AS OF NOVEMBER 13th, 2015

The undersigned **ADNAN KHAN c/o 16 Rivington Street, Manchester, UK** ("Producer") has been engaged to produce master recording(s) entitled "**THE MENACE**" a/k/a "**PANDA**" to feature the performances of **SIDNEY SELBY p/k/a "DESIIGNER" c/o The Law Offices of Robert A. Celestin, 1650 Broadway, Suite 505A New York, NY 10019** ("Artist").

1.     (a)     In consideration of the sum of **Two Thousand ($2000.00) Dollars**, receipt of which is hereby acknowledged, and other good and valuable consideration, each master recorded hereunder embodying the results and proceeds of Producer's services (collectively and individually the "Master(s)") will be considered a "work made for hire" for Artist from the inception of recording. If any Master(s) is determined not to be a "work made for hire", it will be deemed transferred to Artist in accordance with this paragraph 1. In such event, Producer hereby assigns to Artist all rights throughout the universe, including but not limited to copyright (and all renewals and extensions thereof under any law now or hereafter existing) in and to all Master(s), from the inception of recording thereof. The Master(s), from the inception of the recording thereof, and all phonograph records and other reproductions made there from, together with the performances embodied therein and all copyrights therein and thereto (including the underlying copyright in the musical composition(s)), throughout the universe, and all renewals and extensions thereof, will be entirely Artist's property, free of any claims whatsoever. Producer hereby waives any claim to any moral rights in the Master(s).

       (b)     Without limiting the generality of the foregoing, Artist and Artist's successors, designees and assigns will have the exclusive, perpetual, unrestricted right throughout the universe: (1) to manufacture, sell, distribute, promote, advertise, and otherwise exploit and advertise phonograph records embodying the Master(s); (2) to lease, license, convey or otherwise use, alter, adapt, change or dispose of the Master(s), or parts thereof, by any method now or hereafter known in any media or field of use; (3) to perform publicly phonograph records, whether on radio, television, in audiovisual works or elsewhere, and other reproductions embodying those Master(s), all upon such terms as Artist may approve in Artist's sole discretion; and (4) to refrain from doing any and/or all of the foregoing in Artist's sole discretion without any payment to the Producer other than the fees and royalties referred to in paragraph 1(a).

       (c)     Artist has the perpetual right to use and to grant to others the right to reproduce, print, publish, or disseminate, by any method now or hereafter known in any media or field of use, Producer's name in connection with the Master(s) for any purpose. Notwithstanding the foregoing, Artist shall use best efforts to provide Producer appropriate credit on all phonograph records labels, sleeves, liner notes, and one-quarter (1/4) page advertising concerning the Master(s) as follows: **"Produced by MENACE".** No inadvertent failure to provide credit on labels, sleeves, liner notes or advertisement shall be deemed a material breach provided such failure is promptly corrected prospectively.

\Desiigner\Khan\Producer Declaration\11/13/15

2.      Producer hereby acknowledges and agrees that Producer will not produce or co-produce any recording for any person, firm or corporation other than Artist prior to the date three (3) years after the Master(s) have been delivered to Artist in accordance with the provisions of the Agreement unless Artist advises Producer in writing that it does not plan to exploit the Master concerned.

3.      (a)      Producer agrees not to retain or disseminate any copies of the Master(s), including without limitation, so-called "reference copies" of the Master(s) or copies in any other medium. Producer acknowledges that any dissemination of any version or portion of the Master(s) prior to commercial release of the Master(s) will cause Artist irreparable harm. Producer further agrees to deliver to Artist all original session files/recordings (including, without limitation, all multi-trade tapes and computer hard drives or other digital storage devices and related files) and any derivatives and reproductions thereof.

        (b)      Producer warrants and represents that all music, sounds, compositions, ideas, designs and other materials that are furnished or selected by Producer in connection with the Master(s) is original and will not infringe upon or violate any copyright of or infringe upon or violate the right of privacy or any other right of any person or entity; Producer further warrants and represents that Producer is free to grant all rights granted herein.

        (c)      Producer agrees to hold Artist, its successors, licensees and assigns harmless from and against all damages, losses, costs and expenses (including reasonable attorney's fees and costs) ("Liabilities") which Artist or any of its successors, licensees or assigns may suffer or incur by reason of the breach of any of the representations, warranties or covenants made in this declaration. Producer will reimburse Artist promptly, on demand, for any and all such Liabilities incurred by Artist.

4.      Producer hereby agrees to look solely to  for the payment of fees and/or royalties, if any, and acknowledges that any payment made to Producer by Artist is made solely as an accommodation to , and agrees not to assert any claim in this regard against Artist or attempt to prevent the manufacture, sale or distribution of phonograph records.

5.      This Agreement is entered into the State of New York.


**AGREED TO AND ACCEPTED:**


By: _____

**SIDNEY SELBY p/k/a**
**"DESIIGNER"**

By: _____

**ADNAN KHAN**

\Desiigner\Khan\Producer Declaration\11/13/15

2